BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF CINCINNATI et al., Plaintiffs,

v.

The DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE, REGION 5, et al., Defendants.

No. C–1–74–185.

United States District Court,
S. D. Ohio, W. D.

April 18, 1975.

208

C. R. Beirne, Beirne & Wirthlin, John A. Lloyd, Jr., Frost & Jacobs, Cincinnati, Ohio, for plaintiffs.

Ralph Winkler, Asst. U. S. Atty., for defendants.

## OPINION

DAVID S. PORTER, District Judge:

This action is brought by the Board of Education of the City School District of the City of Cincinnati, Ohio, and by Robert L. Braddock, Virginia K. Griffin, Henry C. Kasson, Charles D. Lindberg, Mary T. Schloss, individually and as members of the Board of Education of the City of Cincinnati. Accordingly, these parties are hereinafter referred to collectively as the "plaintiffs" and sometimes simply as "Cincinnati." The Cincinnati Board of Education will occasionally be referred to only as the "Board" or "CBE," and these designations should be read as including, where

appropriate, the named members thereof. The City School District also will be sometimes referred to simply as the "School District" or "CSD." These parties appear as defendants in another case pending before this court sub nom. Bronson v. Board of Education of the City School District of the City of Cincinnati, C–1–74–205, a case which in some respects is a companion action to the suit presently at issue, and which in other respects is a sequel to a prior desegregation litigation in this Court sub nom. Deal v. Cincinnati Board of Education, 244 F.Supp. 572 (S.D.Ohio, 1965), aff'd, 369 F.2d 55 (6 Cir., 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L. Ed.2d 114 (1967), and aff'd on other issues, 419 F.2d 1387 (6 Cir., 1969), cert. denied, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971). The procedural posture of the Bronson case is set out in our opinion in that case of January 30, 1973 (doc. 57), (appeal pending before the Sixth Circuit).

The defendants in the case at bar are the Department of Health, Education and Welfare (Region 5) (hereinafter, the "Department" or "HEW"); Caspar Weinberger, Secretary, Department of Health, Education and Welfare (herein, the "Secretary"); Virginia Trotter, Assistant Secretary, Office of Education (the "Assistant Secretary"); Terrell Bell, Commissioner of Education (the "Commissioner"); and Mary Jane Calais, Regional Commissioner, Office of Education (the "Regional Commissioner" or "Ms. Calais"). These parties are designated collectively as the "Defendants" or "HEW". The Office of Education is sometimes designated as "OE", and the Office of Civil Rights as "OCR".

As will be more fully developed herein, the Cincinnati City School District applied in December, 1973, to the Department for an award of funds under the Emergency School Aid Act (ESAA), 20 U.S.C. § 1601 et seq. (1972), re-enacted and amended by P.L. 93–380, §§ 641–646 (August 21, 1974). On April 25, 1974, the School District was determined by the Assistant Secretary to be ineligible for such funding (four grounds of ineligibility were given), whereupon this action was initiated to secure review of that determination, declaratory and injunctive relief, and an award of funds. The funds sought have been held in escrow pursuant to an agreed order approved by this Court issued June 21, 1974 (doc. 5), and amended June 27, 1975 (doc. 6).

The case is submitted on cross-motions for summary judgment pursuant to Rule 56, Fed.R.C.P. The parties have submitted lengthy memoranda with affidavits and documents in support of their motions and reply memoranda, in addition to the materials submitted in connection with the request of plaintiffs for a preliminary injunction. The Court has carefully considered the submissions of the parties and has engaged in extensive research of its own. The parties have concentrated their fire on certain issues. The Court has endeavored to consider all the issues raised by the pleadings and the evidence. Additionally, the Court has addressed issues proper for it to consider *sua sponte, e. g.,* jurisdiction. Specifically, we considered the applicability of the Administrative Procedure Act as well as the Declaratory Judgment Act as a form of remedy, *infra* at p. 210. If any argument made by the parties is not discussed herein it is because it was found without merit or not resolvable in view of the resolution of other issues herein upon which they are dependent.

## I. PRELIMINARY MATTERS

### A. JURISDICTION—FEDERAL QUESTION

The Court has jurisdiction over this suit, which challenges HEW's determination that plaintiff is ineligible for ESAA funds, under its federal question jurisdiction. 28 U.S.C. § 1331(a). Adams v. Richardson, 351 F.Supp. 636, 640 (D.D.C., 1972), injunction entered, 356 F.Supp. 92 (D.D.C., 1973), aff'd en

banc, 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973); *cf.* Kelley v. Metropolitan Co. Bd. of Ed., Tenn., 372 F.Supp. 528, 537–538 (M.D.Tenn., Feb. 23, 1973), injunction entered, 372 F.Supp. 540 (M.D.Tenn., Dec. 19, 1973). Important questions arising under the Constitution and laws of the United States are involved, and substantially more than $10,000 exclusive of interest and costs is claimed.[1]

In view of our determination that jurisdiction exists under § 1331(a), it is unnecessary to decide whether 28 U.S.C. § 1343(4) would provide an alternative, independent basis for jurisdiction in this action. But compare *Kelley, supra,* at 372 F.Supp. 528, 537, with Adams v. Richardson, *supra,* 351 F.Supp. 636, 640 (conclusion of law Para. 2). Nor is it necessary to consider the appropriateness of assuming jurisdiction over this action under 28 U.S.C. § 1361, a basis not suggested by the parties. But see *Kelley, supra,* at 538–539, 540, 543; and Adams v. Richardson, *supra,* at 640.

■■■ Plaintiffs seek relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. For reasons that will appear, we also treat this case as one brought under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. Of couse, the Court recognizes that neither the Declaratory Judgment Act nor the Administrative Procedure Act afford any additional basis for jurisdiction.

Getty Oil Co. (Eastern Operations), Inc. v. Ruckelshaus, 467 F.2d 349 (3 Cir. 1972), cert. den., 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973). Rather, the purpose of the Administrative Procedure Act is to define procedures and the manner of judicial review of agency action but not to confer jurisdiction. Bramblett v. Desobry, 490 F.2d 405 (6 Cir., 1974); Bruton v. Schnipke, 370 F.Supp. 1157, 1159 (E.D.Mich.1974);[2] The Declaratory Judgment Act likewise is remedial only and not jurisdictional. See, *e. g.,* Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671–672, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950), holding that the Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction."

■ We hold that the provisions of these Acts are applicable, and we have formed our analysis of the issues herein accordingly. *Cf. Kelley, supra;* Adams v. Richardson, *supra.* See *infra,* Part IV. Our analysis is also shaped by the procedural posture of the case, namely, its submission on cross-motions for summary judgment. Rule 56, Fed.R.Civ.P.

### B. ADMINISTRATIVE PROCEDURE ACT

■ In holding that the Administrative Procedure Act (APA) is applicable, we take the view that the grant process under the ESAA is not "agency action

---

1. Plaintiffs also assert jurisdiction under 28 U.S.C. §§ 1343, 1346 and 42 U.S.C. § 1983. Reliance on § 1983 is misplaced as § 1983 is remedial, not jurisdictional. Howard v. State Dept. of Highways, 478 F.2d 581 (10 Cir., 1973); Quarles v. Texas, 312 F.Supp. 835 (D.Tex., 1970); Kochhar v. Auburn University, 304 F.Supp. 565 (D.Ala., 1969). And, in any event, § 1983 is plainly inapplicable, even in conjunction with 28 U.S.C. § 1343(3), as this statute does not apply to the federal government or to actions taken under color of federal law. See, *e. g.,* Jones v. Perrigan, 459 F.2d 81 (6th Cir. 1972); Etheridge v. Schlesinger, 362 F.Supp. 198, 201 n. 5 (E.D.Va., 1973).

We also hold that 28 U.S.C. § 1346 is inapposite. Kelley v. Metropolitan Co. Bd. of Ed., Tenn., *supra.*

2. Also see: Ove Gustavsson Contracting Co. v. Flocke, 278 F.2d 912 (2d Cir. 1960), cert. den., 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 188 (1960); Zimmerman v. United States Government, 422 F.2d 326 (3d Cir. 1970), cert. den., 399 U.S. 911, 90 S.Ct. 2200, 26 L.Ed.2d 565, reh. den., 400 U.S. 855, 91 S.Ct. 26, 27 L.Ed.2d 93 (1970) (collecting authorities); Richardson v. United States, 465 F.2d 844, 849, n. 2 (3d Cir. 1972) (en banc), cert. den., 410 U.S. 955, 93 S.Ct. 1420, 35 L.Ed.2d 688 (1973); Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe, 370 F.2d 529 (10th Cir. 1967); Pan American World Airways, Inc. v. C.A.B., 129 U.S.App.D.C. 159, 392 F.2d 483, 494 (1968).

. . . committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Also see: Northeast Community Organization, Inc. v. Weinberger, 378 F.Supp. 1287, 1294 (D.Md.1974); *Kelley, supra*; Kelsey v. Weinberger, 363 F.Supp. 521 (D.D.C., 1973), rev'd on other grounds, 162 U.S.App.D.C. 159, 498 F.2d 701 (1974). The discretion vested in HEW under the ESAA is narrowly circumscribed, not only by the specific provisions of that Act, but also by the provisions of Title VI of the Civil Rights Act of 1964 (P.L. 88–352), 42 U.S.C. §§ 2000d et seq.[3] Adams v. Richardson, *supra*. Also see, Kelsey v. Weinberger, *supra*. Indeed, we feel that a final determination of ineligibility under the ESAA program is fully analogous to similar action taken under the 1964 Act wherein judicial review under the APA is specifically provided for. 42 U.S.C. § 2000d–2.

■ Accordingly, this Court's scope of review is defined by 5 U.S.C. § 706. Cf. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971). In our judgment, this case is one in which neither review for substantial evidence nor trial de novo is appropriate. *Overton Park*, at 414, 91 S.Ct. 814. Rather, in this case the requisite review is that mandated by the Court in *Overton Park, supra*, except that in this instance the appropriate officials are the Assistant Secretary of HEW, the Commissioner of Education, and the Regional Commissioner of the Office of Education (OE), Region 5. Specifically, under the dictates of § 706 and *Overton Park*:

> "The court is first required to decide whether the Secretary acted within the scope of his authority. Schilling v. Rogers, 363 U.S. 666, 676–677 [80 S.Ct. 1288, 1295–1296, 4 L.Ed.2d 1478] (1960). This determination

naturally begins with a delineation of the scope of the Secretary's authority and discretion. L. Jaffe, Judicial Control of Administrative Action 359 (1965). As has been shown, Congress has specified only a small range of choices that the Secretary can make. Also involved in this initial inquiry is a determination of whether on the facts the Secretary's decision can reasonably be said to be within that range.

> \* \* \* \* \* \*

> "Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. \* \* \*

> \* \* \* Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

> "The final inquiry is whether the Secretary's action followed the necessary procedural requirements."

These three basic inquiries are taken up below, although not in the precise order as listed above, in connection with the actions of the Assistant Secretary (OE).

For the present, we note that § 706 requires that "(i)n making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party . . ." The relevant record in this case is that compiled

---

3. ESAA regulations make this explicit: 45 C.F.R. § 185.03 makes the ESAA program subject to 45 C.F.R. subchapter A. A provision of this subchapter—§ 100a.262(a)—in turn provides that federal financial assist-

ance is subject to the regulations issued by the Secretary HEW and approved by the President to effectuate the provisions of the Civil Rights Act of 1964. These regulations appear at 45 C.F.R. 80.1, et seq.

in the department through April 25, 1974, or at the latest, through June 27, 1974. Findings by OCR or the OE subsequent to the April 25 determinations of ineligibility and information gathered by these offices *after* that date are not therefore part of the "record" subject to examination in our review of those determinations. For this reason, in making its review the Court has disregarded the affidavit of Ortha O. Barr, Jr., and the "Factual Summary" incorporated therein, which were filed pursuant to an order of this Court on December 19, 1974 (Doc. 16), the Court at that time reserving judgment on the relevancy of these submissions. The danger which we wish to avoid is the possibility that this affidavit and its attachments present "merely *'post hoc'* rationalizations, Burlington Truck Lines v. United States, 371 U.S. 156, 168–169 [83 S.Ct. 239, 9 L.Ed.2d 207] (1962), which have traditionally been found to be an inadequate basis for review. Burlington Truck Lines v. United States, *supra*; SEC v. Chenery Corp., 318 U.S. 80, 87 [63 S.Ct. 454, 459, 87 L.Ed. 626] (1943)." *Overton Park*, at 419, 91 S.Ct. at 825. However, these submissions have been considered in connection with our exploration of the scope of the controversy which may persist between the parties in view of our resolution of the issues herein. See *infra*, Part VI.

## C. OTHER PROCEDURAL ISSUES

Defendants raise certain other preliminary or procedural matters which they feel should operate to preclude this Court from reaching the merits of this case. Thus, defendants have argued that plaintiffs, by not availing themselves of the Act's waiver of ineligibility provisions, see *infra*, Part III(c), have failed to exhaust available avenues of administrative recourse. Defendants also argue that the funds held in escrow by order of this Court pending the outcome of this litigation have been provisionally allocated to another Local Educational Agency (LEA), and that this suit is therefore "moot." This latter argument seems to assume that even if Cincinnati is successful in this litigation, the funds sought by plaintiffs would be awarded to that other LEA.

■ The short answer to defendants' mootness argument is that if Cincinnati were to prevail on the merits of the case, the matter would be remanded for a determination of the relative merits of the CSD and any other appropriate LEA plan. See Kelley v. Metropolitan Co. Bd. of Ed., Tenn., 372 F.Supp. 540, 560–561 (M.D.Tenn.1973).

We are likewise of the view that "exhaustion" is not an appropriate analysis: The proper concern in this case is with the compliance or non-compliance of the parties with the procedural and substantive requirements of the Act—whether viewed as raising questions of "mootness," "exhaustion," "notice," or "failure to establish eligibility." Each of these matters is dealt with below in greater detail. But the bottom line is this: If Cincinnati failed to comply with any applicable provision of the Act or any valid administrative regulation, its case must fail. HEW also will be held to this standard.

## II. REQUIREMENT THAT LOCAL EDUCATIONAL AGENCY ESTABLISH ITS ELIGIBILITY AND ENTITLEMENT FOR ESAA GRANT:

### A. Burden on Local Educational Agency To Establish Its Eligibility

The grant process established by the Emergency School Aid Act is an executive function, within the jurisdiction of the Dept. HEW. Within HEW, the program is administered by the Assistant Secretary for Education, a defendant herein. Applications for ESAA funds are processed by the staff of the Office of Education, and decisions pertinent to such applications are within the discretion of the Assistant Secretary and her staff, subject to the statutory provisions of the Act itself and the administrative

guidelines adopted by the Office of Education pursuant to the Act. 45 CFR 185.01 et seq., 38 FR 3452 (Feb. 6, 1973).

■ Essentially two general decisions are made by the Assistant Secretary and her staff in regards to each application: First a determination of eligibility or ineligibility is required.[4] In this regard, only applications which demonstrate compliance with the Act, particularly with 20 U.S.C. § 1605(a), (c), (d) and (1), and with the regulations which implement the Act, 45 CFR 185.01 et seq., and specifically with § 185.03 and §§ 185.41–45, are eligible for funding. The burden is on the applicant to make an appropriate application and to demonstrate its compliance by supplying "such information as the Assistant Secretary shall require by regulation." § 1609(a). The Act provides for "basic grants" as well as for a variety of special project grants, e. g. bilingual projects. The Cincinnati School District applied only for the basic grant, thus it was required to demonstrate eligibility only with respect to the general requirements of § 1605 (*supra*) along with those of § 1609(a) and (b) as implemented by the "basic grant" administrative regulations set out at 45 CFR §§ 185.11–14.

The second general area of decision-making committed to the Office of Education is the difficult process of funding. The Act appropriated one billion dollars for the fiscal year ending June 30, 1974, but reserved 5% of this amount for *special metropolitan area projects* (under § 1608) and an additional 13% for various other *special projects* (§ 1603). The funds not subject to reservation are required by the Act to be apportioned among the states in such a manner that each state receives $75,000.-00 plus an additional amount depending on the ratio of the number of its minority students to the number of minority students as a whole in the country (sub-ject to the limitation that each state will be apportioned at least $100,000.00). Amounts apportioned to particular states but not awarded are subject to re-apportionment during the last 60 days of the fiscal year. § 1604(b)

Thus, clearly the Assistant Secretary had authority under the ESAA to make these determinations of ineligibility and to deny funds to those LEA's which were determined to be ineligible. The Assistant Secretary therefore acted within the scope of her authority although it remains to be seen whether the Assistant Secretary's actual determinations were arbitrary and whether they were made in accordance with the procedural requirements of the Act.

B. *Weighted Guidelines:*

■ Funds may be used only for activities authorized by the Act. § 1606. Programs competing for funds are ranked according to criteria detailed in § 1609(c) and (d)(1), as supplemented by the weighted guidelines set out at § 185.14 for basic grants. The Assistant Secretary is required to award funds to applicants "in the order of their ranking on the basis of the criteria set out in (§ 185.14(a), (b))." § 185.14(c)(1). However, the Assistant Secretary is *not required*:

> ". . . to approve any application which does not meet the requirements of the Act or this part, or *which sets forth a program*, project, or activity *of such insufficient promise for achieving the purposes of the Act that its approval is not warranted.*" § 185.14(c)(2) (Emphasis added)

As in the case of the initial decision regarding eligibility, determinations as to funding must be made in the first instance by the Assistant Secretary and the Office of Education. Kelley v. Metropolitan Co. Bd. of Ed., Tenn., 372 F. Supp. 540, 560–561 (M.D.Tenn. Dec. 19, 1973).

---

4. 20 U.S.C. § 1609(a), (b).

### III. COMPLIANCE WITH THE PROCEDURAL REQUIREMENTS OF THE ACT

#### A. Notice Requirements of 20 U.S.C. 1609(d)(2):

The Act provides that the local educational agency must be notified of the grounds of ineligibility sufficiently in advance of any final determination of ineligibility to allow it an "appropriate opportunity" to supplement or modify its application. 20 U.S.C. § 1609(d)(2). The tacit assumption is that the local agency will avail itself of this opportunity in the event that it feels a final determination of ineligibility would be unjustified. An informal conference is also possible. § 185.43(k). Informal or staff negotiations of this type are the rule, the alternative avenue of recourse being an application for waiver of ineligibility made directly to the Secretary. The waiver process authorized the Secretary to permit funding of otherwise ineligible projects *provided* the local agency *corrects* the practice which led to the ineligibility determination and offers assurances that the practice will not reoccur. § 1605(d). The waiver concept originated with the Senate version of the ESAA, and the notice requirement first appeared in the House version.[5] Both were included in the conference bill, the two being complementary.[6]

As enacted the ESAA mandates:

"(2) The Assistant Secretary shall not finally disapprove in whole or in part any application for funds submitted by a local educational agency without first notifying the local educational agency of the specific reasons for his disapproval and without affording the agency an appropriate opportunity to modify its application." 20 U.S.C. Sec. 1609(d)(2)

This provision is easily understood and requires little explication. The Conference Report notes:

"The House amendment, but not the Senate amendment, required that the Assistant Secretary must notify each local educational agency whose application has been rejected of the reason for his disapproval and to afford the agency a reasonable time to modify its application. The conference substitute contains the House provision and requires the Assistant Secretary to provide an appropriate opportunity to the applicant to modify its application." Conference Report No. 798, 1972 U.S. Code Cong. & Admn.News, pp. 2608 at 2667–2668

In the only reported decision on the subject it was held that the adoption by the Assistant Secretary of an incorrect interpretation of the legal provisions regarding eligibility, resulting in an incorrect and unlawful determination of ineligibility, had the effect of violating this provision as the local agency had not been given an "appropriate opportunity" to substantiate its position. Kelley v. Metropolitan County Bd. of Educ., Tenn., 372 F.Supp. 540, 560 (M.D.Tenn. Dec. 19, 1973)[7]

In the case at hand it is abundantly clear that the Cincinnati School District

---

5. The "Emergency School Aid and Quality Integration Act," S.1557, which separately passed the Senate April 26, 1971, but was subsequently incorporated in the Education Amendments Act of 1972 P.L. 92–318 as Title VII of the Act to conform with the "Higher Education Act of 1971," H.R. 7248, which passed the House on November 4, 1971, containing an analogous "Emergency School Aid Act of 1971." See Senate Report No. 92–604, 1972 U.S.Code Cong. and Admin.News. (92d Cong., 2d Sess.) pp. 2595, 2662.

6. Differences between the two versions of the school aid act were ironed out by a joint committee. See Conference Report No. 798, 1972 U.S.Code Cong. & Admin.News, pp. 2608, 2662ff.

7. HEW officials were found to have adopted —in response to White House demands—a policy of refusing to fund transportation costs under the Act and its predecessor (ESAP), but informing applicants only that transportation costs were being assigned to a "very low priority" (as outright rejection, *as practiced*, violated both the Act and HEW regulations.)

was notified in advance of the final determination of ineligibility and of the grounds therefor and was given "appropriate opportunity" to substantiate or modify its application. (For purposes of the present discussion we here assume that the pertinent policies and interpretations applied in this instance by the OE were consistent with the Act and the regulations implementing it.) Indeed, Cincinnati was notified of the deficiencies in its application well in advance of the final determination of ineligibility, giving it more than a mere "reasonable time" to submit the required documentation.

The undisputed facts, in so far as they appear from a close examination of the affidavits and exhibits submitted by the parties, reveal the following:

Cincinnati initially began to actively consider applying for ESAA funds after an August 2, 1973 meeting in Chicago of Cincinnati and HEW officials, including Dr. Donald R. Waldrip, the Superintendent of the Cincinnati School District (CSD) and Mr. John H. Grate, Coordinator of Planning and Development of the Cincinnati Board of Education (CBE), on behalf of Cincinnati, and Ms. Mary Jane Calais, Regional Commissioner, ESAA Program, for HEW. In general, the Cincinnati officials were encouraged to believe that their program could qualify under the Act. (Doc. 11) (Plaintiff's Motion: Affidavit of John H. Grate, para. 1(a); Affidavit of Donald R. Waldrip (Waldrip), p. 1.) Dr. Waldrip reiterated the main points expressed at the Chicago meeting in a letter to Ms. Calais dated August 6, 1973. Dr. Waldrip understood that the plans adopted by the CBE "constituted the beginning of eligibility," and that with respect to the required component of a plan to reduce racial isolation, that the CBE had "a plan that will, *with refinements,* qualify us for eligibility under ESAA guidelines." Doc. 11 (Plaintiff's motion): Ex. 1, p. 1.

Cincinnati officials continued their liason with HEW officials during the preparation of their application, which after several months of preparation was filed on December 26, 1973. Doc. 11: Grate: Para. 2–2d, pp. 1–2. (The Application appears as an attachment to Doc. 4.)

As submitted, the Cincinnati application requested funding for a three-pronged approach toward achieving integration in Cincinnati public schools. The application outlined plans for (1) staff (faculty) reassignments, (2) new school construction and (3) voluntary student transfers involving "alternative and exemplary programs" as incentives. Application, Sec. II, p. 1, ff. The new construction plan is sometimes referred to as the Magnet School concept. See, *e. g.*, Doc. 11: Ex. 2 (Grate-Coleman letter of February 14, 1974). The total funding request was $3,230,508.00.

An initial "turnaround" or tentative approval was given to the application within the usual 48 hours after receipt. Doc. 13, p. 2. In this connection it is worth noting that the integration plan before the HEW contained, apparently as an integral part, the December 10, 1973, Board resolution, which is discussed at length *infra* at pages 225–226 et seq. Application, II—16, 17. Also see Doc. 13, p. 2 and notes 1, 2. Subsequently, of course, the Board adopted its January 14, 1974, non-implementation resolution. Doc. 11: Ex. 21, 22.

In any event, Cincinnati was notified on January 18, 1974, of the deficiencies in its application and was advised that eligibility was contingent on supplying the documentation requested. Ten areas in which deficiencies were noted were discussed in detail, and the necessary information was sought in one case "as soon as possible," and in the other instances "no later than Tuesday, February 18, 1974." Doc. 7, Attachment 1 (A–1), Letter of Ms. Ruth Hart Stromberg, Chief, Elementary and Secondary Education Branch, HEW, to Dr. Waldrip, p. 6.

Subsequently, on February 7, Mr. Grate and Mr. James Jacobs, Assistant

Superintendent of Research and Development of the Cincinnati Public Schools, met with Ms. Beverly Coleman, Program Coordinator for Ohio (OE, Region V), and discussed the application in detail. Ms. Coleman requested additional data, particularly with reference to the anticipated effect of the Magnet Schools Component (the plan which was most directly related to reducing racial isolation in the schools). At this point only data on the effectiveness of the open enrollment plan during the summer of 1973 had been submitted. Grate, p. 7, Para. 4

The following day, February 8, Ms. Stromberg again wrote requesting Cincinnati to come forward with the information and assurances requested in her January 18 letter. This letter reiterates that without the information, ". . . in my opinion there is a serious question whether your District has satisfied the eligibility for assistance requirements as set forth in Section 185.11 of the Regulations." Doc. 7: A–2.

On February 14, Cincinnati followed up on the February 7 conference with Ms. Coleman by supplying some additional information (as requested by Ms. Coleman). Doc. 11, Ex. 2.

About a week later, on February 22, Mr. O. O. Barr, an Equal Opportunity Specialist, attempted on behalf of the Office of Civil Rights (OCR) to obtain the needed information, explaining why that already sent was insufficient. The exact respects in which the materials on file needed supplementation were spelled out. Particular emphasis was placed on minority group isolation and the failure of the Cincinnati plan to effectively reduce this problem. Doc. 7. A–3. This item was regarded as especially important by the HEW officials in their internal analysis of the CBE application. See e. g., Doc. 7: A–7, letter of March 13, by Ms. Stromberg to Kenneth A. Mines, Director, Office for Civil Rights (OCR), Region V.

In early March an "on-site" review of the Cincinnati plan was conducted by HEW. Also, about this time, specifically, March 7, 1974, Mr. Grate met with Mr. Barr (OCR) and discussed the Open Enrollment Plan. Grate Para. 7, p. 4. While the upshot of these meetings is not entirely clear, Dr. Mines, the OCR Regional Director, notified Dr. Waldrip again on March 20 that the information requested on January 18 was still not forthcoming. The letter relates that certain information (pertaining to Board actions) had been promised to the review team by March 15, but that now the promised materials were not expected until March 25 at the earliest. The letter notes that some funding decisions would be announced on March 25 and that the CBE would be well advised to supply the data requested in time for April funding. Doc. 7: A–4.

Parenthetically, on March 8, Ms. Coleman had called Mr. Grate and told him that a line-by-line examination of the application along with additional data supplied on February 14 led her to believe that certain expenditures in the plan could not be funded by ESSA monies. Ms. Coleman explained each item which was not being approved. Elimination of all of these items left a balance of approximately $911,000.00 in the grant application. Doc. 11, Grate p. 3 ff. Cincinnati efforts seem to have shifted at this point from establishing eligibility to restoring the amounts cut as inappropriate. Doc. 11: Grate pp. 5, 6 and Ex. 3, 4, 5, and 6. These efforts included political pressure along with the more usual forms of persuasion. See: Doc. 11: Grate p. 5 and Ex. 3, 4.

On April 5, another letter was sent to Dr. Waldrip from Regional Director Mines, again detailing exactly what was needed in the way of documentation and assurances if Cincinnati was to establish its eligibility. Doc. 7: A–5. In this crucial letter, four areas in particular were spelled out—Faculty Assignment, Student Classroom Assignment, Property Transfers to Non Public Schools, and Discrimination Against Children. The faculty assignment program had been a pivotal feature of the original application and had survived the January

"non-implementation" resolution, but on March 18, CBE imposed a 20% limitation on faculty transfers with the result that Cincinnati no longer was eligible for funding under HEW regulations. See: 45 CFR 185.43(b)(2). Director Mines noted that the deficiency was easily remedied, but that nonetheless, "it is necessary to take corrective action in order to establish eligibility for assistance under the Emergency School Aid Act." A-5, p. 2. Significantly, information on each of the four matters discussed in the April 5 communication had been requested in the January 18 letter (A-1).

Ultimately, Ms. Calais notified Dr. Waldrip on April 25 that the Cincinnati School District *"has failed to establish its compliance with the eligibility requirements* of the Emergency School Aid Act and its implementing regulations." Doc. 11: A-6, p. 2 (Emphasis in original.) Information and assurances requested in each of the four areas outlined on April 5 had not been received. Dr. Waldrip was informed of the possibility of obtaining a waiver directly from the Secretary, and the door was also left open for resolution of these differences at the staff level. (A-6).

In the interest of completeness, it should be noted that the April 25 ineligibility determination followed not only the exhaustive April 5 warning of Mr. Mines (A-5), but also another pointed warning by Ms. Coleman in her April 9 letter to Mr. Grate. Doc. 11, Ex. 6. In part, Ms. Coleman notes:

"Our office is aware of additional information requested from Cincinnati Public Schools by the Office for Civil Rights to determine compliance with the District's desegregation plan. However, this letter *only* refers to programmatic aspects of Cincinnati's proposal not to eligibility/compliance aspects." P. 3.

Finally, Board President, Charles D. Lindberg, responded on May 2 to the April 25 determination of ineligibility. Doc. 11: Ex. 7. Mr. Lindberg's letter, addressed to Ms. Calais, challenges OCR's conclusion that the Board's January non-implementation resolution was itself a segregative act, suggesting that OCR had not considered all the information which might be available on this issue. The letter also asserts generally Mr. Lindberg's disagreement "with many of the matters raised in the (April 5 and April 25) letters." (p. 1) The letter also states that the matter had been turned over to the Board's attorneys. (p. 2) This suit was then filed on May 14.

Not until June 26 or 27, 1974, were any of the documents and written assurances which led to the ineligibility determination supplied to HEW. On that date, two working days before the end of the fiscal year, and nearly six weeks after this suit had been filed, Dr. Waldrip forwarded to Mr. Barr (OCR) the requisite assurances regarding student classroom assignments and non-public schools along with the necessary documentation in the latter case.[8] This letter, argues HEW, "did not request a waiver of ineligibility, but merely constituted an admission by the school district that for over sixty days they had failed to respond to the April 25 letter of ineligibility or to continue the administrative process for correcting their ineligibility." Doc. 7: p. 15. As our discussion below indicates, we find this conclusion inescapable. But apart from the question of the Cincinnati School District's response, it is clear that defendants complied with the procedural

---

8. There is some question whether even these submissions—which had been sought since January—were sufficient. Doc. 9, p. 15. In any event, OE maintains that it completed the routine process of reallocating ESAA funds on June 4, and that this reallocation alloted all remaining appropriated funds un- der the ESAA for fiscal 1974. Doc. 9, A-8, affidavit of Max P. Gabbert, Director of Social Systems (acting for the Regional Commissioner for Education, Region V). Plaintiffs contest this. Letter of November 5, 1974 and Supplemental Affidavit of John H. Grate and attachments.

requirements of the Act regarding notice of ineligibility.

### B. *Cincinnati School District's Response*

We turn now to the question whether the Court can on the basis of all the undisputed facts determine whether or not the Cincinnati School District in fact furnished the data, documentation and assurances required of it under the Act and regulations *as applied by HEW*. We do not at this point consider whether the interpretation and practices or policies adopted by HEW in its application of the Act and regulations were as a matter of law valid and supportable. This latter question will be considered elsewhere. See *infra*, Part IV.

The department argues that the Cincinnati School District did not supply the requisite documentation and assurances. The significance of this is that, if correct, Cincinnati has in effect waived its eligibility for 1974 funds—that is, assuming the validity of all pertinent HEW practices and policies.

Plainly, the Court must conclude that in each of the four areas noted by the letter of ineligibility, Cincinnati was deficient and had not availed itself of the opportunities afforded it by the OCR staff to come forward with the needed materials. Each area will be discussed in order.

### 1. *Plan to reduce racial isolation of minority students.*

It is undisputed that the CSD did not—and in fact refuses to—give assurances to HEW that a plan as effective as the December Resolution in eliminating minority group isolation would be undertaken. Without further discussion of this point it is apparent then that CSD's claim of eligibility depends upon the correctness of its contention that the non-implementation resolution was not an unconstitutional act and is not a proper substantive basis for ineligibility under the Act.

### 2. *Faculty assignments.*

With respect to the faculty assignments problem, it is plain that Cincinnati did not provide the assurances and documentation sought by HEW, but here again the problem is *not* merely one of technical deficiencies. As in the case of Cincinnati's refusal to implement a desegregation plan as effective in reducing racial isolation as the December Plan, the problem here was Cincinnati's refusal to comply with HEW's substantive demands. Again, the problem will be stated at this point with reference only to Cincinnati's failure to comply with HEW's requests although provided an "appropriate opportunity" to do so, and without reference to the validity of the pertinent regulations and HEW policies and practices thereunder.

Following events chronologically, initially the problem of reassigning faculty members to reduce the racial identifiability of minority group schools presented no serious problem. Indeed, reassignment along these lines constituted one of the three main elements of the plan outlined in the Cincinnati application. However, the application itself apparently did not contain the requisite information for an HEW determination that the plan comported with ESAA regulations, Ms. Stromberg included in her January 18 letter to Dr. Waldrip the following request for information:

"V. FACULTY ASSIGNMENTS

"Please furnish a schedule containing the following information for each school:

"A. *Faculty*

"1. Total number

"2. Number and percentage of minority

"B. *Percentage of minority students*"

(doc. 7: A–1, p. 4).

The information sought by Ms. Stromberg, it seems went to the question of Cincinnati's eligibility under §

1605(d)(1)(B) and the regulations thereunder. § 1605(d)(1)(B) provides:

"(d)(1) No educational agency shall be eligible for assistance under this chapter if it has, after June 23, 1972—

(B) had in effect any practice,. policy, or procedure which results in the disproportionate demotion or dismissal of instructional or other personnel from minority groups in conjunction with desegregation or the implementation of any plan or the conduct of any activity described in this section, *or otherwise engaged in discrimination based upon race, color, or national origin in the hiring, promotion, or assignment of employees of the agency* (or other personnel for whom the agency has any administrative responsibility)." [Emphasis added.]

This statutory mandate is supplemented by Regulation 185.43(b)(2) which is set out below.[9]

The information and assurances sought by Ms. Stromberg in her January letter are required by § 185.13(1)(2).[10]

It is important to bear in mind that the specific ground of ineligibility charged against the Cincinnati School District is the assignment of full-time teachers in a manner which causes certain schools *"to be identified as intended for students of a particular race."* (A–6, p. 3) (Emphasis in original.) Essentially, this charge reduces itself to the assignment of a disproportionate number of minority race teachers to "minority group isolated schools," *i. e.,* schools in which more than 50% of the students are members of minority groups. As is made clear by the memorandum contra submitted in behalf of HEW (doc. 13), this problem would have resolved itself under the December plan by eliminating "minority group isolated schools." The problem also could have been resolved to the satisfaction of HEW by the January 14 faculty reassignment program *as adopted.* However, the CBE subsequently modified the January program by imposing a 20% limitation on the number of teachers which could transfer from any one school under the plan (March 18, 1974). See Affidavit of Charles D. Lindberg, p. 9–10 and Ex. 25

---

9. (2) No educational agency shall be eligible for assistance under the Act if, after June 23, 1972, it has had or maintained in effect any other practice, policy, or procedure which results in discrimination on the basis of race, color, or national origin in the recruiting, hiring, promotion, payment, demotion, dismissal, or assignment of any of its employees (or other personnel for which such agency has any administrative responsibility), including the assignment of full-time classroom teachers to the schools of such agency in such a manner as to identify any of such schools as intended for students of a· particular race, color, or national origin.

An earlier provision, 38 Fed.Reg. 3463, 45 C.F.R. § 185.44(d)(3) (1973), which created a 75–125% parameter was rescinded on August 16, 1973, and replaced by the current 38 Fed.Reg. 18899, 45 C.F.R. § 185.44(d)(3) (1973) (waiver proviso).

10. § 185.13(1)(2), entitled "compliance with eligibility requirements," reads:

(2)(i) An assurance that the applicant has not had or maintained in effect prior

to the date of its application for assistance under the Act, and will not have or maintain in effect subsequent to such date, any practice, policy, or procedure with respect to minority group personnel in violation of § 185.43(b) (or that if such a violation has occurred, application for a waiver of ineligibility has been made to the Secretary); and (ii) a statement of the number of principals, full-time classroom teachers, and athletics head coaches, by race, for the academic year immediately preceding (a) the year in which the applicant first implemented any portion of a plan for desegregation or for elimination or reduction of minority group isolation in its schools pursuant to an order of a Federal or State court or administrative agency, or (b) the year in which the applicant first implemented any portion of a plan described in subpart B of this part, whichever is earlier, and of the number of athletics head coaches, by race, as of the date of its application;

(1974 Amended Staff Balance Plan). It is asserted that one reason the March 18 limitation was adopted was that certain civil rights groups were opposed to aspects of the original plan. Lindberg, pp. 9–10 and Ex. 26. To reiterate, the effect of the 20% limitation was to limit transfers of staff to no more than 20% of the full-time staff at any one school during each year of the program until the desired staff balance was achieved.

Director Mines' letter of April 5 reveals that some modification had been aired during the March 7 on-site review. Mr. Mines writes:

". . . The review team discussed this matter with you on March 7, 1974, and indicated that the Office for Civil Rights would remain satisfied if additional flexibility were built into the plan so long as the proportion of minority group full-time classroom teachers at each school would be between 75 per centum and 125 per centum of the proportion of such minority group teachers which exists on the faculty as a whole" (A–6, p. 1).

Within these parameters, the 20% limitation—

". . . creates a problem because it will cause three elementary and two secondary schools to remain with teaching faculties which will have proportions of minority group teachers beyond the allowable range of 75–125 percent. Thus, five of the ten predominantly minority group schools, which currently have faculty assigned in a manner which increases or confirms their racial identifiability, will continue to have such faculty" (A–6, p. 2).

The letter sets out the five schools (i. e., Ach, Sawyer, Hays, Rockdale, S. Avondale), and states the number of teachers to be moved and the number outside of the 75–125% range. Finally, Mr. Mines warned that in each of the five schools "it is necessary to take corrective action in order to establish eligibility for assistance under the Emergency School Aid Act." (A–5, p. 2)

From the letter of ineligibility (of April 25), it appears that Dr. Waldrip spoke by telephone with a member of the HEW review team on April 17 and predicted that as a result of staff reduction only two schools would remain with a disproportionate minority faculty as of September, 1974, and that this would be eliminated by the following year. Nevertheless, HEW concluded that:

"This constitutes *a failure to establish compliance with the eligibility requirements of the Act and Regulations*" (A–6, p. 4). (Emphasis in original.)

Significantly, the 75–125% parameter is not a *specific* requirement of the Act or the regulations then in effect. (See note 8) However, assuming the validity of this requirement, it is undisputed that Cincinnati did not take advantage of the opportunity afforded it to bring its program into line with HEW policies and thereby establish eligibility. Thus, it appears that this issue *in and of itself* would have precluded an HEW determination of eligibility and therefore would also have precluded favorable action on Cincinnati's application for ESAA funds.

### 3. *Classroom assignments*

The third ground of ineligibility asserted by HEW on April 25 was a violation of § 185.43(d)(5) by virtue of the fact that in Cincinnati schools "*several hundreds of students are assigned to racially isolated or racially identifiable classes for which no educational justification has been furnished.*" (A–6, p. 5) (Emphasis in original.) [11]

---

11. The relevant language is :

 (d) *Discrimination against children.* No educational agency shall be eligible for assistance under the Act if, after June 23, 1972, it has had or maintained in effect any practice, policy, or procedure which results or has resulted in discrimination against children on the basis of race, col-

The problem was one which had been the subject of considerable discussion among the Cincinnati and HEW officials. After the April 5 letter warning that this problem could result in ineligibility, Dr. Waldrip spoke with someone in HEW and offered his verbal assurance that the procedure used to assign students would be adjusted to eliminate this problem and that a written confirmation of this assurance would be forwarded to the Office for Civil Rights. "Therefore," Ms. Calais' letter of April 25 stated, *"assuming that such written confirmation is received, this area will not raise any question regarding eligibility."* (A–6, p. 5) (Emphasis in original.) However, it is not disputed that this assurance was *not*, in fact, sent until June 26 or 27 (Doc. 11, Ex. 8). While Dr. Waldrip was still contending at that late date that there were no racially isolated or identifiable classes for which there was no educational justification, the fact is that the relevant regulation *presumes* that racially identifiable tracks or classes are the result of assignments on the basis of race *unless* educational justification is demonstrated, something which Cincinnati had not done. Thus, through at least June 26 or 27, Cincinnati had failed to establish its eligibility in this regard as well, despite ample opportunity to do so.

### 4. *Transfers of property or services*

The fourth ground of ineligibility also consists of a technical deficiency in the Cincinnati application, in this case in regard to Regulation 185.43(a) which makes ineligible any school district that has transferred property or made available services after June 23, 1970, to a nonpublic school "without a *prior* determination that such nonpublic school or school system is not operated on a ra-

cially segregated basis as an alternative for children seeking to avoid attendance in desegregated or integrated public schools." (Emphasis added.)

The problem which developed was simply the failure of the Cincinnati officials to supply the prerequisite documentation in regard to certain nonpublic schools. The problem was raised in the January 18 letter (A–1, items II, III and IV, pp. 3–4). The February 22 letter of Ms. Stromberg also dealt at length on this point, warning "there are no exceptions to the requirement established by the Regulations that any LEA including the Cincinnati Public School System, must make a nondiscrimination determination prior to transferring any property or providing any services to a nonpublic school." (A–3, p. 2) Indeed, Ms. Stromberg reiterated this warning, stating: "In other words, there is no exception to this requirement set forth in Section 185.43(a) of the ESAA Regulations." (*Id.*) Again, on March 20, Cincinnati was notified that the information and documents requested in the January 18 letter (which would include this material) had not yet been received. And, of course, Director Mines also dealt with these deficiencies in his April 5 letter at some length (A–5, pp. 3–4). This letter in fact advises Dr. Waldrip how best to secure this documentation. Dr. Waldrip responded by letter on April 9 and spoke directly with a member of the OCR team on April 17 and followed that conversation with another letter dated April 18. However, the April 25 letter of ineligibility states that determinations with respect to at least four schools still had not been received and that information regarding several others had not yet been obtained by Cincinnati (and, therefore, of course, had not been received by OCR).

---

or, or national origin, including but not limited to:

(5) Assigning students to ability groups, tracks, special education classes, classes for the mentally retarded, or other curricular or extracurricular activities on the basis of race, color, or national origin.

Racially or ethnically identifiable groups, tracks, or classes which cannot be justified educationally under the criteria set out in paragraph (c) of this section shall be presumed to be assigned on the basis of race, color, or national origin.

Finally, it is undisputed that not until the June 26/27 letter did Dr. Waldrip come forward with any of the additional determinations requested in the April 25 letter. Moreover, there is some real question whether this submission, late as it was, fully complied. Memorandum In Opposition To Plaintiffs' Cross-motion (doc. 13, p. 17).

Thus the conclusion urged by the defendant seems unavoidable:

"The fact of the matter is that the Cincinnati District realized very late that it had not pursued the negotiation or administrative waiver procedure as it should have done following receipt of the April 25 notification of ineligibility and attempted hastily to rectify that failure when the fiscal year was within hours of closing." Id.

Thus, despite appropriate opportunities to do so and sufficient proper notification regarding each ground of ineligibility, the CSD failed to take advantage of these opportunities to modify or substantiate its position even though it could have done so in this case simply by supplying the required documentation and assurances.

## C. Exhaustion

As has already been mentioned, HEW argues that the Cincinnati School District had available an additional avenue of administrative recourse in that the ESAA authorized the Secretary of HEW to waive the ineligibility of a Local Educational Agency upon application directly to the Secretary. 20 U.S.C. § 1605(d). However, this procedure—plainly—is available only if the local educational agency is willing to accept HEW's determination of ineligibility and is willing to eliminate the particular ground (or grounds) of ineligibility and to give assurances that the offending practice (or practices) will not reoccur. § 1605(d)(2). Kelsey v. Weinberger, 162 U.S.App.D.C. 159, 498 F.2d 701 (No. 73–1960, 1974). Just as plainly an

LEA is not required to exhaust the waiver procedure insofar as it seeks to challenge an HEW determination of ineligibility based on an erroneous interpretation of law and does not seek to circumvent the administrative procedures for the correction and waiver of uncontroverted ineligibilities.

Perusal of the relevant provisions of the Act reinforces this view. Section 1605(d)(1) provides that "[n]o educational agency shall be eligible for assistance under [the ESAA] if it has, after June 23, 1972—[engaged in any of four specified practices]; except that, in the case of any local educational agency which is ineligible for assistance by reason [of having engaged in any of the four specified practices] [such LEA] may make application for a waiver ineligibility . . . ." The LEA's application for waiver must:

"specify the reason for its ineligibility, contain such information and assurances as the Secretary shall require by regulation in order to insure that any practice, policy, or procedure, or other activity resulting in the ineligibility *has ceased to exist or occur* and include such provisions as are necessary to insure that such activities do not reoccur after the submission of the application." § 1605(d)(1) (Emphasis added.)

A waiver may be approved only by the Secretary, whose duties in this matter are nondelegable. § 1605(d)(2). Moreover, the Secretary may only approve a waiver application if he has determined that the offending practice or policy has in fact "ceased to exist." In this respect, § 1605(d)(3) mandates that:

"(3) Applications for waiver shall be granted by the Secretary upon determination that any practice, policy, procedure or other activity resulting in eligibility has *ceased to exist*, and that the applicant has given satisfactory assurance that the activities prohibited in this subsection will not reoccur."

This mandate however is just a specific application of the general requirement that:

"(4) No application for assistance under this chapter shall be approved prior to a determination by the Secretary that the applicant is not ineligible by reason of this subjection." § 1605(d)(4).

The subsection also specifies that:

"(5) All determinations pursuant to this subsection shall be carried out in accordance with criteria and investigative procedures established by regulations of the Secretary for the purpose of compliance with this subsection.

(6) All determinations and waivers pursuant to this subsection shall be in writing. *The Committee on Labor and Public Welfare of the Senate* and the *Committee on Education and Labor of the House of Representatives* shall each be given notice of an intention to grant any waiver under this subsection, . . ."

The cumulative effect of this language is unmistakably clear: The waiver process offers school districts ineligible for ESAA funds by virtue of specified post-June 23, 1972 practices an opportunity to establish eligibility by ceasing the practice and by providing assurances that the practice will not reappear. It provides no opportunity for an LEA to contest an allegedly erroneous determination of ineligibility.

The question therefore is: To what extent does the CBE actually challenge the validity of HEW determinations of ineligibility made pursuant to § 1605(d)(1) as being erroneous? Ineligibility under this subsection follows upon a determination that an educational agency has, after June 23, 1972:

"(A) *transferred* (directly or indirectly by gift, lease, loan, sale, or other means) *real or personal property to, or made any services available to, any transferee* which it knew or reasonably should have known to be a nonpublic school or school system (or any organization controlling, or intending to establish, such a school or school system) *without prior determination* that such nonpublic school or school system (i) is not operated on a racially segregated basis as an alternative for children seeking to avoid attendance in desegregated public schools, and (ii) does not otherwise practice, or permit to be practiced, discrimination on the basis of race, color, or national origin in the operation of any school activity;

(B) *had in effect any practice, policy, or procedure* which results in the disproportionate demotion or dismissal of instructional or other personnel from minority groups in conjunction with desegregation or the implementation of any plan or the conduct of any activity described in this section, or otherwise *engaged in discrimination based upon race, color, or national origin in the hiring, promotion, or assignment of employees of the agency* (or other personnel for whom the agency has any administrative responsibility);

(C) in conjunction with desegregation or the conduct of an activity described in this section, *had in effect any procedure for the assignment of children to or within classes which results in the separation of minority group from nonminority group children for a substantial portion of the school day,* except that this clause does not prohibit the use of bona fide ability grouping by a local educational agency as a standard pedagogical practice; *or*

(D) *had in effect any other practice, policy, or procedure,* such as limiting curricular or extracurricular activities (or participation therein by children) in order to avoid the participation of minority group children in such activities, *which discriminates among children on the basis of race, color, or national origin;"* § 1601(d)(1). (Emphasis added.)

The Cincinnati School District was found to be ineligible on the grounds that it had engaged in *each* of the four proscribed practices (§§ (a) through (d)). See Doc. 7:A–6 (letter of April 25, 1974). These alleged practices will be referred to (as they are by the April 25 letter) as "transfers of property or services (relating to § (A)); "teacher assignment" (relating to § (B)); "student assignment" (relating to § (C)); and "discrimination against children" or "nonimplementation" (relating to § (D)).

■ Most clearly, the plaintiffs challenge as invalid HEW's determination that the Cincinnati School District had engaged in any practice or policy resulting in "discrimination against children" on the basis of race as a result of its January 14 "nonimplementation" resolution. Plaintiffs characterize this determination as based on an unsupportable legal theory that rescission of a voluntary plan of desegregation by a unitary, albeit *de facto* segregated, school system is in and of itself an unconstitutionally segregative act. See, *e. g.*, Doc. 11 (pp. 9–10). Plaintiffs find support for their legal argument in Brinkman v. Gilligan, 503 F.2d 684 (6 Cir., Nos. 73–1974–75, 1974). Plaintiffs also contend that this position is contrary to § 1618 of the ESAA as well as in violation of 20 U.S.C. § 1651 (1972). See, *e. g.*, doc. 11, p. 23. Defendants dispute this characterization of their position. See, especially, Doc. 13, pp. 7ff. Thus defendants state: "Several cases suggest that the rescission *without anything more* would constitute a violation of the Fourteenth Amendment, but that is not HEW's position in this case." *Id.*, at p. 9, note 15. In either event, however, the waiver process did not offer a meaningful administrative mechanism for resolution of the contested validity of this determination, and therefore the Cincinnati School District cannot be said to have failed to have exhausted its administrative remedies in this respect.

■ Likewise, plaintiffs seriously challenge the legal validity of the HEW determination of ineligibility on the ground of "teacher assignment" (§ 1605(d)(1)(B)). See, *e. g.*, doc. 11, pp. 25–27. *Inter alia*, plaintiffs there contend that HEW's position involves a "strained and unreasonably harsh construction" of the relevant regulation and that HEW's position is in violation of 20 U.S.C. § 1651. These are not contentions resolvable by the waiver process.

But as to the two remaining asserted grounds of ineligibility it is unclear whether plaintiffs actually challenge the validity of any pertinent practice or policy adopted by HEW or its interpretation of any particular statute or regulation. However, they do assert that proof that the CSD was not ineligible by reason of "property transfers" or "student assignments" appears in the June 27, 1974 letter of Dr. Waldrip, doc. 11, p. 28. See also Ex. 8. But plaintiffs do not contend that this letter asked for a waiver of ineligibility nor do they suggest how long, *i. e.*, how late into the fiscal year, HEW reasonably was required to wait for Dr. Waldrip to forward the assurances and documentation accompanying his June 27 letter.

Nevertheless, we accept the allegations of the Amended Complaint as sufficiently putting in issue the validity of these two determinations, although we note that the briefs of plaintiffs do not elaborate any cogent theory as to why these determinations are invalid. Amended Complaint, paragraphs 10 and (g) (doc. 2); see *infra* IV C (pp. 66, 72). Accordingly, we hold that plaintiffs have sufficiently complied with the requirements of the exhaustion doctrine, so far as that doctrine is applicable to this case.

## IV. VALIDITY OF DETERMINATIONS OF INELIGIBILITY

As indicated, on April 25, 1974, the Office of Education sent notification to the Cincinnati School District, in accord-

ance with 20 U.S.C. § 1609(d)(2), that the District was found to be ineligible for ESAA funds. According to HEW, the notification letter of April 25, 1974 (doc. 7:A–6) explained "each and every ground of ineligibility" and further "emphasized that a waiver of ineligibility as to each ground was available as an administrative relief for the finding." Doc. 7, p. 3.

Briefly, the four alleged grounds of ineligibility in the order in which they appear in the letter were as follows:

1) Discrimination against children in contravention of 20 U.S.C. § 1605(d)(1)(D) and 45 CFR 185.43(d);

2) Teacher assignments in contravention of § 1605(d)(1)(B) and 45 CFR 185.43(b)(2);

3) Student assignments in contravention of § 1605(d)(1)(C) 45 CFR 185.-43(c) and 185.43(d)(5); and

4) Transfers of property or services in contravention of § 1605(d)(1)(A) and 45 CFR 185.43(a).

■ We proceed now to review each of these asserted grounds of ineligibility in turn. As previously indicated, however, our scope of review is a narrow one—particularly when, as here, our inquiry is bounded by the procedural confines of cross-motions for summary judgment. We must ascertain whether, on the basis of the undisputed facts, the Secretary's determinations of ineligibility were arbitrary, or capricious, or an abuse of discretion. See 5 U.S.C. § 706; *Overton Park, supra.* While we propose to examine each of the asserted grounds of ineligibility, it is apparent that if any one of the Secretary's determinations withstands this test, the defendant is entitled to summary judgment as a matter of law in accordance with Rule 56, Fed. R.Civ.P.

## A. *Discrimination Against Children Or Nonimplementation*

Before evaluating the way or ways in which the Cincinnati School District allegedly discriminated against children,

we must examine the applicable statutory and regulatory provisions. Title 20 U.S.C. § 1605(d)(1)(D) provides in pertinent part:

"(d)(1) No educational agency shall be eligible for assistance under this chapter if it has, after June 23, 1972—

. . . . . .

(D) had in effect any other practice, policy, or procedure . . . which discriminates among children on the basis of race, color, or national origin . . ."

And Section 185.43(d) of the Departmental Regulations provides in part as follows:

"(d) Discrimination against children. No educational agency shall be eligible for assistance under the Act, if, after June 23, 1972, it has had or maintained in effect any practice, policy, or procedure which results or has resulted in discrimination against children on the basis of race, color, or national origin . . ." 45 CFR 185.-43(d).

■ The word "discrimination" is not specifcally defined in the ESAA, nor in the regulations thereunder, nor in Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c. Basically, however, discrimination refers to a denial of equal protection. It is recognized that school authorities have a constitutional obligation not to engage in discrimination in this sense. For example, in Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1 at 13, 91 S.Ct. 1267 at 1275, 28 L.Ed.2d 554 (1971), the Supreme Court speaks of "the basic constitutional requirement that the State not discriminate between public school children on the basis of their race." Discriminatory acts, then, are those which violate the Constitution, and discrimination is another way of referring to de jure segregation. Thus, § 185.43(d) provides a very broad and general limitation on eligibility which complements the more specific limitations enunciated

in subsections (a), (b), and (c) of § 185.43, for in effect, subsection (d) merely provides that any education agency which is engaging (or has engaged since June 23, 1972) in unconstitutional acts of discrimination or de jure segregation is ineligible to receive funds under ESAA.

We turn now to the facts. On December 10, 1973, the outgoing "lameduck" majority of the Cincinnati Board of Education voluntarily adopted a "Resolution Ordering the Racial and Economic Integration of Pupils in the Cincinnati Public Schools." (doc. 11, p. 19) The resolution contained a number of recitals, with references to various committee and task force reports, purporting to list specific past acts of racial discrimination in the Cincinnati public schools stemming from various actions and inactions of the Board. The resolution also contained an acknowledgment by the Board of a legal obligation to desegregate the entire school system, and a policy statement that "each school shall enroll pupils in a manner which substantially reflects the racial and economic characteristics of the district as a whole." Further, the resolution directed that plans be developed to implement that policy, and in aid thereof, set forth certain guidelines including the rescission of present attendance districts and a "desegregation" deadline of September 1, 1974. Attached to the above resolution were three exhibits: A, B, and C. Exhibits A and C purported to show the "extent of school segregation in Cincinnati Public Schools" and the "continued increase in proportion of blacks attending majority black schools." Exhibit B allegedly showed "Racial Patterns in Teacher Assignment" and stated that the segregative nature of these patterns may actually have been worse then (1972–73) than at the time of Cincinnati's previous school desegregation litigation, six years earlier (1966–67).

On January 14, 1974, a newly elected school board majority adopted a resolution alleging that the December plan and resolution were made in bad faith and that they were incomplete, inaccurate, unclear, and unworkable. Then, denying that the December plan was being "rescinded," the new majority asserted that it was just "not being implemented at this time." We think such a distinction lacks substance for it is clear that the Board action of January 14, 1974 amounted to an effective rescission of the earlier December plan. Indeed, a new plan was adopted by means of the resolution of January 14, 1974, which provided primarily for voluntary transfers through an open enrollment policy and for faculty ratios in substantial proportion to the district as a whole. In March, however, this "January plan" was modified so that a limitation was placed upon the number of faculty members to be moved by September 1974.

On the basis of the foregoing facts, the Office of Education in its letter of April 25 stated:

". . . it is clear that the January 14, 1974 nonimplementing resolution has served to delay, impede, and obstruct implementation of the plan set forth in the December 10, 1973 resolution. Numerous judicial decisions have held that an action by a newly elected school board delaying, impeding, or obstructing the lawful implementation of a desegregation plan is an unconstitutional segregative act. It is therefore clear that such action constitutes discrimination against children contrary to the provisions of 45 CFR 185.43(d)."

The above excerpt, viewed by itself, might suggest that HEW based its finding of discrimination against children upon the single fact of rescission or nonimplementation. And indeed, plaintiffs contend that rescission was the sole basis for defendants' finding of ineligibility § 185.43(d). See doc. 11, at pp. 9, 21, and 23. But HEW emphatically denies that its finding under § 185.43(d) was based upon the single element of rescission (Doc. 13, pp. 9 and 14). Here, then, is a genuine issue of fact which by

itself might well foreclose any grant of summary judgment on this issue. Nevertheless, because the rescission factor has been extensively and proficiently briefed by the parties to this action and because it has a bearing not only on the present case but also on the ultimate resolution of Bronson, et al. v. Board of Education, et al., No. C–1–74–205 (filed May 29, 1974), currently pending in this Court, we shall venture some observations at this time.

Viewed in its entirety, the letter of April 25 reveals that HEW was not acting in a vacuum. The April 25 letter refers at length to the December resolution, and thereby indicates HEW's awareness of the various recitals and attachments, including the data regarding racial isolation of students and racial identifiability of schools on the basis of faculty assignments. That HEW was not concerned solely with the isolated act of rescission but with the effect of that rescission in light of Cincinnati's allegedly segregated schooling pattern is, in our opinion, revealed by the following excerpt from the April 25 letter:

"On January 14, 1974, the newly elected Board passed a resolution resolving not to implement the directives of the December 10, 1973 resolution. *Thus, the old boundary lines were reinstated,* the budget appropriation for planning and consultation was eliminated, the authority for the Superintendent to develop and implement plans for complete racial and economic integration of students was eliminated, and the September 1, 1974 deadline for the completion of desegregation was postponed." (Emphasis added.)

Moreover, as indicated above, HEW specifically denied that its finding under § 185.43(d) was based on the single element of rescission. In reply to plaintiffs' cross motion for summary judgment, HEW asserts the following:

"Several cases suggest that the rescission without anything more would constitute a violation of the Four-

teenth Amendment, but that is not HEW's position in this case . . ." Doc. 13, at 9 & n. 15.

HEW also contends that:

". . . implicit in the citation of the case law which accompanied this rescission ground was the finding by OCR that a sufficient basis was to be found in the information available to it to show a pattern of discrimination such as that admitted by the Board in the December 10 Resolution. Thus, DHEW never relied solely on the effective rescission of the December 10 integration plan standing in isolation as a violation of the ESAA regulations." Doc. 13, at 14.

HEW cites specifically to various factors in addition to rescission which purportedly establish a broad pattern of discriminatory acts by the Cincinnati School Board rendering them ineligible for ESAA funds under § 185.43(d). See Doc. 13, at pp. 10–12. These factors include the allegedly disproportionate assignment of minority teachers to racially identifiable minority schools; and the conclusion of OCR that there was sufficient factual basis for the December plan recitations regarding such matters as the allegedly discriminatory policies pertaining to pupil attendance zones and temporary classroom units. *Id.*

We believe, then, that HEW's finding of ineligibility under § 185.43(d) was not based upon the element of rescission alone but that it was based upon rescission plus the other factors referred to above. For reasons previously enunciated, however, our belief on this matter does not negate the importance of evaluating rescission as an independent factor —especially in light of plaintiffs' contention that "the rescission of a desegregation resolution, per se, is an act without legal significance." Doc. 11, at p. 23.

Several District Courts have suggested that a school board's rescission of a previously adopted, bona fide desegregation plan constitutes an independent, per

se constitutional violation. See, e. g., Keyes v. School Dist. No. 1, Denver, 303 F.Supp. 279 (D.Colo.1969); Oliver v. School Dist. of Kalamazoo, 346 F.Supp. 766 (W.D.Mich.1971); Martin v. Evansville-Vanderburgh School Corp., 347 F. Supp. 816 (S.D.Ind.1972); Brinkman v. Gilligan, No. 72–137 (S.D.Ohio February 7, 1973). But the Sixth Circuit Court of Appeals recently cast doubt on these prior holdings. See Brinkman v. Gilligan, 503 F.2d 684 (6th Cir. 1974) Nos. 73–1974–75. We remain cognizant of plaintiffs' claim that the December plan was made in bad faith and that it was inaccurate and unworkable. And we think it clear that nonimplementation of a flagrantly bad faith or unworkable plan would not carry the same consequences as the rescission of a bona fide plan. It is not our intention, however, to here address the merits of the December plan, but only to discuss what consequences, if any, follow from the rescission of a bona fide plan.

In the Court of Appeals' *Brinkman* opinion, at 697, racially imbalanced schools, certain optional attendance zones, and the Dayton School Board's rescission of previously adopted resolutions were held to be factors which operated "cumulatively in violation of . . . the Equal Protection Clause." The District Court, in the *Brinkman* case, had earlier found as a matter of fact that the majority of Dayton schools have student populations which are racially imbalanced and that no general effort had been made to racially balance the schools. HEW might well argue, based in part on the recitals of the December resolution, that the same findings could apply equally to Cincinnati.

The District Judge in *Brinkman* further found significant potential for increased racial separation in certain optional attendance zones. This finding, of course, also relates to racial imbal-

ance in the schools and HEW could cite to Recital (3)(ii) of the December resolution as one example of analogous segregative actions in Cincinnati.

Even more significant, perhaps, are the factual parallels between the rescission in *Brinkman* and the one confronting us. In both cases, desegregation resolutions were passed by a "lameduck" majority and subsequently rescinded by a Board of different composition. And in both cases, the resolutions

". . . recognized the existence of racial segregation in the [district's] schools, the role played by the Board in the creation of the racial patterns and the concomitant responsibility of the Board to eradicate these patterns through affirmative action. The types of affirmative action recognized included the elimination of the old attendance zones and the transportation of students for the purpose of achieving the city-wide racial balance of students . . ."

73–1974–74, *supra* at 696.

On the surface, then, the Cincinnati rescission could just as readily be considered part of a cumulative constitutional violation as was the Dayton rescission.[12]

Regarding the element of rescission, Chief Judge Phillips declared for the Court of Appeals in *Brinkman*:

"The question of whether a rescission of previous Board action is in and of itself a violation of appellants' constitutional rights is inextricably bound up with the question of whether the Board was under a constitutional duty to take the action which it initially took. . . . If the Board was not under such a duty, then the rescission of the initial action in and of itself cannot be a constitutional violation. If the Board was under such a duty, then the rescission becomes a part of the cumulative violation, and it is not necessary to ascertain whether the re-

---

12. On the other hand, the similarity of the resolutions could conceivably be cited by the plaintiffs as an indication of a "too-facile" adoption of the Dayton format, which in turn might be cited as an indication of a lack of independent thought or evaluation and, thus, a lack of good faith. See our discussion at pp. 227–228, *supra*.

scission *ipso facto* is an independent violation of the Constitution.

"In view of our conclusion in this case that the rescission was a part of the cumulative violation of appellants' constitutional rights, we find it unnecessary to pass on the question of whether the rescission by itself was a violation of those rights." *Supra* at 697.

And earlier in the opinion, Judge Phillips also stressed that " . . . we do not pass upon the question at the present time as to whether the rescission of the Board resolutions in and of itself constituted an independent violation of the Constitution." *Supra* at 693. These statements indicate that the Court of Appeals did not intend to hand down an unequivocal, hard set rule that rescission has "no legal effect," or that rescission is "without legal significance" or that rescission can never "be a basis for Board liability" as plaintiffs would have us believe. To the contrary, the Court's apparent intent was to stop short of a rule of that sort and instead to leave open the question of whether rescission in an appropriate case might be independently violative of the Constitution. Hence, the only generalizations we would draw from the Sixth Circuit's *Brinkman* opinion are:

 One, that the act of rescission, in and of itself, is not *inevitably* violative of the Equal Protection Clause; and two, that an act of rescission may be considered part of the cumulative evidence of a possible constitutional violation. Cf. Berry v. Benton Harbor School Dist., 505 F.2d 238 at p. 242 (6th Cir. 1974).

The above discussion indicates both that rescission can have a bearing upon findings of de jure segregation and that the same sort of elements which justified the finding of a cumulative constitutional violation in Dayton are arguably present in the CSD. There is, of course, one major difference which we have not yet discussed—i. e., the final

affirmance by the Sixth Circuit on December 9, 1969 of Deal v. Cincinnati Bd. of Ed., wherein the Court of Appeals upheld the District Court's finding that racial imbalance in the Cincinnati public schools was not caused by any act of discrimination on the part of the School Board. See 419 F.2d 1387 (6th Cir. 1969), cert. denied, 402 U.S. 962, 91 S. Ct. 1630, 29 L.Ed.2d 128 (1971).

The *Deal* finding, of course, does not necessarily mean that the Cincinnati School District has not caused, furthered, or maintained racial imbalance since *Deal,* nor does it necessarily mean that the District is not presently discriminating against children in some manner. We refer to the Sixth Circuit's decision in Oliver v. Michigan State Bd. of Education, 508 F.2d 178 (6th Cir. 1974) to emphasize that even if the Board has taken no action since *Deal,* such inaction may be the basis for a finding of unconstitutional discrimination. In *Oliver, supra* at p. 182, Judge Celebrezze, speaking for the Court, stated that:

"A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' *action or inaction* was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies." (Emphasis added.)

Plaintiffs contend that they have not only been resolutely neutral, but that in many instances the Board has gone a step beyond neutrality by employing "those techniques which it believed stood the best chance to provide students a quality integrated education and to avoid those policies which exacerbate racial imbalance." Doc. 11, pp. 11–12. Defendants, on the other hand, cite to a number of alleged acts of commission and omission from which they can argu-

ably conclude that the "neighborhood school policy followed by the Board . . . is not racially neutral." See Recital H of the December resolution.

To recapitulate, the fact that the School Board effectively rescinded the December resolution does not, by itself, automatically support a finding of ineligibility under 20 U.S.C. § 1605(d)(1)(D) or 45 CFR 185.43(d) because, even assuming that the December plan was made in good faith, it would have to be determined whether the lame-duck board "was under a constitutional duty to take the action which it initially took." *Brinkman, supra* 503 F.2d at 697. But nonimplementation or rescission of a bona fide plan, coupled with other factors such as those alleged in HEW's Memorandum in Opposition to Plaintiffs' Cross-Motion for Summary Judgment (Doc. 13) and those included among the recitals of the December resolution, could support such a finding of ineligibility for they could cumulatively give rise to the aforementioned duty.

The applicable standard regarding motions for summary judgment is set out in Rule 56(c), Fed.R.Civ.P., which provides that a summary judgment is proper, when it appears that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Reading the record alternatively in the light most favorable to each side, the inevitable conclusion is that genuine issues exist as to facts material to the issue of discrimination against children. Accordingly, we cannot conclude, as a matter of law, that HEW abused its discretion in finding the Cincinnati School District ineligible under 45 CFR 185.-43(d) for ESAA funds. By the same token, we cannot conclude, as a matter of law, that HEW did not abuse its discretion in this regard. In short, this issue simply is not resolvable at this stage.

### B. *Faculty Assignments*

The CSD was determined to be ineligible as a result of a continuing violation after June 23, 1972, of § 1605(d)(1)(B), as implemented by 45 CFR § 185.43(b)(2). This regulation defines "discrimination on the basis of race . . . in the . . . assignment of any of the local educational agency's employees" so as to include "the assignment of full-time classroom teachers to the schools . . . in such a manner as to identify any of such schools as intended for students of a particular race, color or national origin." The contours of this problem were discussed above at 218–221. As indicated, plaintiffs have declined to resolve this matter administratively and have chosen instead to contest the validity of this determination of ineligibility. Specifically, plaintiffs seek summary judgment in their favor and declaratory relief to the effect:

> "That the action of HEW in requiring that the Board effect an assignment of teachers in every school on the basis of race by September 1975 is arbitrary, beyond the authority of HEW, and contrary to federal law." Amended Complaint, para. (g); Doc. 11, at 27.

To further limit the issue, it may be added that it is apparent and essentially undisputed that HEW pre-conditioned receipt of ESAA funds on the re-assignment of teachers, not "in *every* school," but rather *only* in those schools in which a majority of the students were members of minority groups *and* in which the faculties as well were disproportionately comprised of members of minority groups. Thus, the teacher re-assignment requirement applied at most to ten schools. See, *e. g.*, Doc. 7: A–5(1–2); Doc. 13, at 15.[13]

13. By April 25 the dispute may have been narrowed to two schools. See above at 220.

## 1.

Plaintiff's advance what they consider to be "numerous cogent reasons why the defendants' position on the question of faculty assignment is legally unsupportable." Doc. 11, at 25. Their first argument is that:

"without regard to whether the defendants' position is supported by the applicable statutes and regulations, a school system which by September of 1974 will have eliminated racial identifiability through teacher assignment in all but two of its many schools has achieved substantial and reasonable compliance with any reasonable standard which could be established." Op. cit.

This argument must fail for at least two reasons:

Most obviously, it must fail because it disregards the waiver requirement of the Act. § 1605(d) (*supra*).

What needs to be said at this point is that plaintiffs may have been confused as to the nature or extent of permissible OCR–HEW inquiry on this issue. The precise question at hand was whether racial identifiability resulting from discriminatory faculty assignment had existed *at any time* in the Cincinnati school district *after the date specifed in the Act, i. e. after June 23, 1972.* If such racial identifiability did exist at any time within this period, then the school district was required to apply to the Secretary for a waiver of ineligibility. See p. 34. Thus, the pertinent question was not whether or not Cincinnati had initiated appropriate steps in 1973 to "eliminate the evil to which the Regulation . . . is apparently directed." Doc. 11, at 26. Likewise, it is not especially helpful to know—and certainly not determinative—that Cincinnati was judicially determined not to have engaged in discriminatory faculty assignments prior to July, 1965. Deal v. Board of Education, *supra* at 419 F.2d 1837.

But more importantly perhaps, plaintiffs' first argument must fail for the reason that a waiver could not have been granted—and, therefore, eligibility could not have been established by Cincinnati—except "upon determination that any practice, policy, procedure or other activity resulting in ineligibility *has ceased to exist.*" § 1605(d)(3). Thus, neither the elimination of discriminatory assignments in all but two schools, nor a promise to eliminate all such assignments by September 1975 satisfies the statutory requirement. Kelsey v. Weinberger, 162 U.S.App.D.C. 159, 498 F.2d 701 (No. 73–1960, 1974).

## 2.

Plaintiffs' second argument is that "there is no legal support for the defendants' refusal of funds on the basis of the proposed teacher assignment." Doc. 11, at 25. Plaintiffs concede that the defendant HEW officials relied on 45 CFR § 185.43(b)(2) which prohibits assigning full-time teachers in such a manner as to identify certain schools as intended for students of a particular race, but urge that this reliance is "misplaced." *Id.*, at 26.

We disagree. The undisputed facts convincingly demonstrate that the OCR–HEW determination that certain schools were in fact racially identifiable was not unreasonable, nor was it arbitrary and capricious within the meaning of 5 U.S.C. § 706.

Relevant to this conclusion are the following data: Approximately 25% of the Cincinnati teachers are minority members, and approximately 75% are white. Specifically, at the primary level 28.4% are minority members, and at the secondary level 23.7% are minority members.[14] As to the five schools on

---

14. Exhibits 24, 25.

which the parties focused their attention during April 1974, (see pp. 27–30, *supra*) the following data are deducible from the exhibits before the Court: [15]

| SCHOOLS | TOTAL FACULTY | NO. OF MINORITY | % OF FACULTY COMPOSED OF MINORITY | IDEAL % OF MINORITY FACULTY |
|---|---|---|---|---|
| ACH | 33 | 24 | 73% | 23.7% |
| SAWYER | 38 | 21 | 55% | 23.7% |
| HAYS | 26 | 15 | 58% | 28.4% |
| ROCKDALE | 28 | 21 | 75% | 28.4% |
| S. AVONDALE | 26 | 18 | 69% | 28.4% |

Each of these schools was attended predominantly by minority students.

■ Thus, the predominantly minority-student schools listed above also had a heavily disproportionate number of minority-race teachers. And once it is established that black teachers are so disproportionately assigned to black schools, the responsible school authorities may fairly be required to demonstrate that such assignments were not racially motivated. Davis v. Sch. Dist. of Pontiac, 309 F.Supp. 734 (E.D.Mich. 1970), aff'd, 443 F.2d 573 (6th Cir. 1971), cert. den., 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); United States v. School Dist. 151 of Cook County, Ill., 301 F.Supp. 201 (N.D.Ill.1969), mod. on other grounds, 432 F.2d 1147 (7th Cir. 1970), cert. den., 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971); Booker v. Special School Dist., 351 F. Supp. 799 (D.Minn.1972).

Interestingly, however, plaintiffs do not deny that discriminatory teacher assignments—contributing to the racial identifiability of certain schools—had continued after June 23, 1972 through at least July, 1973; rather, plaintiffs maintain that from July 9, 1973, the policy of the Board was "to eliminate such racial identifiability." Doc. 11, at 26. Plaintiffs argue:

"The undisputed facts show the clear policy of the Board to be to eliminate all such racial identifiability. This policy is traceable from the Superintendent's Proposal for Reducing Racial Isolation (Exhibit. 18) adopted July 9, 1973 and his letter to teachers of August 1, 1973 (Exhibit 19) through item (A) of the January 14, 1974 resolution (Exhibit 22) . . . and Action Motion Number One of the same date (Exhibit 23), and the Guidelines For Voluntary And Mandatory Teacher Transfers To Achieve Staff And Racial Balance (Exhibit 24)." Doc. 11, at 26. (Emphasis added)

Implicit in the foregoing is the admission that some degree of racial identifiability did exist in certain Cincinnati schools as a result of faculty assignments practices, and continued to exist after June 23, 1972 through at least July 9, 1973. The Cincinnati district was therefore ineligible for assistance, subject to a waiver of such ineligibility upon application to the Secretary. § 1605(d).

This conclusion cannot be avoided by virtue of the fact that the OCR was apparently willing to allow the waiver process to be circumvented if Cincinnati in turn was willing to demonstrate its good faith by carrying out the January faculty re-assignment plan, with whatever modifications the Board would adopt, provided only that the end result was within the requested 75–125% parameter. A–6, pp. 1–2. Cincinnati did

---

15. Exhibits 24, 25, A–5 and A–6.

not comply with this request. A–5, A–6. Whether negotiation along these lines was within the scope of authority of the HEW officials involved is therefore not before the Court. *But see* Adams v. Richardson, 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973) (en banc), aff'ing 351 F. Supp. 636 (D.C.1973).

 We do hold, however, that use of the 75–125% limitation as a rule of thumb did not represent an abuse of discretion. Certainly, in determining whether Cincinnati was ineligible by reason of faculty assignments causing certain schools to be racially identifiable, the OCR officials were required to exercise some discretion. See, *e. g.*, Adams v. Richardson, *supra*, 351 F.Supp. 636, 641 (Para. 15), aff'd 156 U.S.App. D.C. 267, 480 F.2d 1159 (1973) (en banc). The specific 75–125% rule adopted in this instance operated as a limitation on the discretion committed to these subordinate officials, albeit a somewhat mechanical one. In this sense of a rule of thumb that channels or guides the discretion of subordinate officials, the 75–125% policy may have much to recommend it. Such a policy, if uniformly adhered to, would be conducive to substantially equal treatment of all applicants (at least with respect to this matter).

### 3.

Plaintiffs' third argument is based on its reading of a related provision of the Education Amendments of 1972, § 801, incorporated in Chapter 37 of Title 20 as § 1651.

Plaintiffs argue:

"The third cogent reason why the HEW defendants' position on the question of teaching staff balance is legally unsupportable is that it is clearly contrary to the statute. § 1651 of Title 20, U.S.C., states:

No provision of this Act shall be construed to require the assignment of students or teachers to overcome racial imbalance.

Thus, whether the plaintiff Board's staff balance plan, as modified, satisfies the defendants' strained and unreasonably harsh construction of CFR 185.43(b)(2) turns out to be immaterial because what the defendants are attempting to impose is a condition to eligibility for ESAA funds which is directly contrary to the unambiguous provisions of the statute." Doc. 11, at 27.

The short answer to this is that no provision of the Act has been construed to "require" the assignment of teachers —except as a condition to eligibility for emergency desegregation funds. HEW has not ordered Cincinnati to reassign its faculty or otherwise required it to do so in the sense of § 1651.

It must be borne in mind that the ESAA provides funds for educational agencies engaged in substantial programs to ameliorate racial isolation and its effects. The provisions of Chapter 36 of Title 20 (the ESAA) and the regulations thereunder thus establish requirements which may well go beyond what is statutorily or constitutionally required of school districts generally. These requirements spell out what a school district must do if it wishes to receive ESAA funds. Sections 1618 of Chapter 36 and § 1651 of Chapter 37 merely declare the sense of Congress that school districts in general are not required as a positive command of law by any provision in the ESAA or of the 1972 Amendments in general to take affirmative action to overcome racial imbalance. Cf. Deal v. Board of Education, *supra*. In the case before the Court, Cincinnati took it upon itself to adopt such a plan. The only question addressed by HEW in this regard was whether by virtue of this plan, as modified, Cincinnati was eligible under the ESAA program despite past discriminatory faculty assignments.

Had Congress intended to declare that no provision of the Act was to be construed in this way, i. e., to require the assignment of teachers to overcome ra-

cial imbalance *as a condition to eligibility* for federal assistance, it was capable of saying so with unmistakable clarity —as is suggested by § 1652, the next subsequent provision of the Act. There Congress with considerable specificity declared that federal officials are forbidden to condition receipt of federal funds on the spending of state funds by state officials for certain specified purposes relating to the transportation of students or teachers.

■ Plaintiffs' argument suggests that § 1651 operates as a ban or prohibition on re-assignment of teachers (and students) to achieve racial balance, which it does not. It merely states that nothing in the Act should be construed so as to create a statutory duty that teachers be reassigned for racial balance.

In sum, plaintiffs' arguments must be rejected. Plaintiffs therefore have not established that the determination of ineligibility in regards to the faculty assignment issue was invalid or an abuse of authority. For this reason summary judgment must be denied them. Plaintiffs likewise are not entitled to the declaratory relief sought in Para. (g) of the *Complaint.*

Moreover, as the facts upon which HEW based its determination are not disputed (the data having been supplied by the CSD in the first place), the Court must conclude as a matter of law that the determination of ineligibility was not unreasonable. Being well supported by the applicable statutes and regulations, that determination may not be said to lack support in the law.

■ The decision of HEW in this case to regard any school in which most of the students were members of minority groups as being racially identifiable when the number of minority teachers assigned to the school exceeded the ratio of minority teachers in the school district as a whole by more than 25% cannot be said to be "arbitrary, capricious or an abuse of discretion" under· the circumstances.[16] In so saying, the Court does not mean to impose "as a matter of substantive constitutional right, any particular degree of racial balance or mixing." Swann v. Board of Education, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1970). We inquire only whether the HEW determination of ineligibility in this regard—i. e., its determination that minority teachers were discriminatorily assigned to certain predominantly minority group schools in such a way as to make those schools racially identifiable—was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706. That is to say, we are not here called upon to evaluate the evidence before OCR–HEW with a view to deciding whether we would reach the same result concerning CSD's eligibility for ESAA funds, nor are we called upon to evaluate that faculty assignment data in light of any current allegations of de jure segregation within the system as a whole in the *Bronson* case. Thus, the present finding will not predetermine any "first instance" inquiry into this matter on the record as it might be developed in that case. Rather, the Court views the HEW practice in question simply as a measure requiring recalci-

16. *See, e. g.*: Robinson v. Shelby Co. Bd. of Educ., 311 F.Supp. 97, 105 (W.D.Tenn.1970), remanded on other grounds, 442 F.2d 255 (6th Cir. 1971) (ratio of white to black teachers in each school to be, within a tolerance of 10%, the same as in the system as a whole) ; Board of Education v. Dowell, 375 F.2d 158, 164 (10th Cir. 1967), cert. den., 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967) (faculty ratio of whites to non-whites in each school to be same as faculty ratio of whites to non-whites in the entire school system, "subject to a reasonable tolerance of approximately 10%.") ; *also see*: United States v. Board of Education, 429 F. 2d 1253 (10th Cir. 1970), later app., 459 F. 2d 720 (10th Cir. 1972), vacated on other grounds, 413 U.S. 916, 93 S.Ct. 3048, 37 L. Ed.2d 1038 (1973), and United States v. Montgomery Co. Bd. of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).

trant school districts to produce "hard evidence of completely desegregated faculties as a precondition to funding under the Act." Kelsey v. Weinberger, *supra,* at 498 F.2d 710. On this basis, summary judgment must be granted in favor of defendants.

### C. *Other Grounds Of Ineligibility*

Two additional grounds of ineligibility asserted by HEW in its April 25 determinations of ineligibility letter remain to be discussed; namely,

 (a) failure by the CSD to provide adequate assurances that student classroom assignments or tracks would not be used in contravention of § 1605(d)(1)(C) and the regulations implementing this provision, 45 CFR 185.43(c) and 185.43(d)(5); and

 (b) failure by the CSD to document that it had not made transfers of property or services in contravention of § 1605(d)(1)(A) and the regulations thereunder, 185.43(a).

We have already stated our conclusion that no material question of fact precludes review of these determinations and in fact that the CSD had not complied with HEW requests for information and assurances relevant to these matters until June 26 or 27, 1974, i.e., that the CSD had not complied with the pertinent requests and practices of the Department in these matters. *Supra,* at 220, 222. What remains for decision is the overriding question of whether the interpretive regulations and the pertinent practices and policies adopted by HEW in its application of the Act were as a matter of law valid and supportable. See *supra,* at p. 218.

We find that this issue is raised, albeit somewhat obliquely, by plaintiffs' amended complaint, Para. 10 of which alleges:

 " * * * Further, HEW has laid down certain additional conditions to the Board's eligibility for such federal aid which are likewise arbitrary and unreasonable and which would have the effect of severely disrupting the operation of the Cincinnati school system without furthering federal educational policy in any material way." Doc. 2, Para. 10.

By way of redress, plaintiffs seek a declaratory judgment:

 "Declaring that the action of HEW in requiring that the Board . . . take certain other actions as a condition of receiving emergency school aid, is arbitrary, beyond the authority of HEW, and contrary to federal law." Doc. 2, Para. (g).

 Unfortunately, plaintiffs' brief in support of their motion for summary judgment does not provide much guidance on these issues, as it merely argues that the June 27 submissions of Dr. Waldrip somehow prove that the CSD was not ineligible. *See* Doc. 11, at 28. Dr. Waldrip's letter of that date is set out in full in the brief. Doc. 11, at 28; and Ex. 8. But our ruling that this letter was insufficient to establish Cincinnati's non-ineligibility prior to the June 4 allocation of remaining ESAA funds, see *supra* at 221, 222, is only buttressed by Dr. Waldrip's admission in this letter that he had not responded to the April 25 letter with the requested written assurances and documentation. Doc. 11, Ex. 8. Cincinnati, if it was to qualify for ESAA funding, was required to come forward with the requisite information and assurances in a timely and appropriate manner. See *supra* pp. 212–213.

Turning now to the question of the validity of the pertinent policies and interpretations, we examine below each of these grounds separately. But this analysis must be preceded by reference to the appropriate point of departure.

 In determining the proper interpretation of these statutory provisions and the legal validity of the agency's regulations and practices, the Court is free to substitute its own judgment—

and has in effect been invited to do so by plaintiffs. APA § 10(e), 5 U.S.C. § 706. Cf. Federal Maritime Commission v. Seatrain Line, Inc., 411 U.S. 726, 745–746, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); and see Kelsey v. Weinberger, 498 F.2d 710 (*supra*). But in so doing, the Court is also mindful of the well established dogma that agency interpretations of this nature are generally entitled to great deference. Griggs v. Duke Power Co., 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. City of Chicago, 400 U.S. 8, 91 S.Ct. 18, 27 L.Ed.2d 9 (1970); Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Power Reactor Co. v. Electricians, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961). And, this deference is particularly appropriate where, as here, the administrative practice in question involves a contemporary construction of the statute by the officers charged with the responsibility of setting its machinery in motion and of making its parts work smoothly and efficiently. Power Reactor Co. v. Electricians, *supra*; Griggs v. Duke Power Co., *supra*; United States v. Groupp, 459 F.2d 178 (1st Cir. 1972). Likewise, some weight must be given to agency interpretations which Congress has not overturned despite its opportunity to do so in re-enacting and amending the statute. See, e. g., United States v. Brown, 290 F.Supp. 542 (D.Del.1968); Bridgeport Hydraulic Co. v. Kraemer, 219 F.2d 929 (1st Cir. 1955).[17] With these caveats in mind, we turn now to the specific issues at bar.

1. *Student classroom assignments*

■ The CSD was determined to be in violation of § 1605(d)(1)(C) which provides:

"(d)(1) No educational agency shall be eligible for assistance under this chapter if it has, after June 23, 1972—

(C) in conjunction with desegregation or the conduct of an activity described in this section, had in effect any procedure for the assignment of children to or within *classes* which results in the separation of minority group from nonminority group children for a substantial portion of the school day, except that this clause does not prohibit the use of bona fide ability grouping by a local educational agency as a standard pedagogical practice." (Emphasis added)

For reasons which should be apparent, we do not think this language precludes classes entirely comprised of minority students where such composition is not the result of classroom assignment practices, but merely a reflection of the fact that a particular school is entirely, or almost entirely, attended only by minority students—at least where such racial imbalance is the result of a consistently neutral application of the neighborhood school concept. See 20 U.S.C. §§ 1618, 1651. *Cf.* Swann v. Board of Education, 402 U.S. 1, 24, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

HEW has implemented this statutory provision through comprehensive and detailed interpretive regulations; specifically, 45 CFR 185.43(c), 185.44(d)(5), 185.44(e) and 185.44(f)(3). Essentially, § 185.43(c) states that an educational agency is ineligible "if after June 23, 1972, it has had or maintained in effect any procedure for the assignment of children to or within classes which results in any separation of minority group from nonminority group children for more than 25 percent of the school day classroom periods . . ." This is qualified to permit "bona fide ability grouping as a standard pedagogical practice." The regulation defines in some detail such grouping.[18] Racially

---

17. The ESAA has been re-enacted with certain amendments, P.L. 93–380, 20 U.S.C. § 1603 (Oct. 1974).

18. 45 C.F.R. 185.43(c) reads:
(c) *Classroom segregation.* No educational agency shall be eligible for assist-

discriminatory classroom or track assignments are also prohibited by 185.-44(d)(5).[19] This provision is particularly important in that it creates a presumption that racially identifiable classes or groupings are the result of assignments on the basis of race unless the assignments can be justified under the 185.43(c) "bona fide ability grouping" criteria.

Regulations §§ 185.44(e) and 185.-44(f)(3) govern requests for waiver of ineligibility by educational agencies found to be in violation of the above provisions.[20] These provisions add little of particular relevance here as they for

---

ance under the Act if, after June 23, 1972, it. has had or maintained in effect any procedure for the assignment of children to or within classes which results in any separation of minority group from nonminority group children for more than 25 percent of the school day classroom periods, in conjunction with desegregation or the conduct of any activity described in section 706 of the Act. This paragraph shall not be construed to prohibit bona fide ability grouping as a standard pedagogical practice. Such grouping is that which is:

(1) Based upon nondiscriminatory, objective standards of measurement which are educationally relevant to the purposes of such grouping and which, in the case of national origin minority group children, do not essentially measure English language skills;

(2) Determined by the nondiscriminatory application of the standards described in subparagraph (1) of this paragraph, and maintained for only such portion of the school day classroom periods as is necessary to achieve the purposes of such grouping;

(3) Designed to meet the special needs of the students in each group determined by the application of the standards described in subparagraph (1) of this paragraph and to improve the academic performance and achievement of students determined to be in the less academically advanced groups, by means of specially developed curricula, specially trained or certified instructional personnel, and periodic retesting to determine academic progress and eligibility for promotion; and

(4) Validated by test scores or other reliable objective evidence indicating the educational benefits of such grouping. (Public Law 92–318, section 706(d)(1)(C); Senate Report No. 92–61, p. 19).

19. In pertinent part § 185.44(d) provides:

(d) *Discrimination against children.* No educational agency shall be eligible for assistance under the Act if, after June 23, 1972, it has had or maintained in effect any practice, policy, or procedure which results or has resulted in discrimination against children on the basis of race, color, or national origin, including but not limited to:

(5) Assigning students to ability groups, tracks, special education classes, classes for the mentally retarded, or other curricular or extracurricular activities on the basis of race, color, or national origin. Racially or ethnically identifiable groups, tracks, or classes which cannot be justified educationally under the criteria set out in paragraph (c) of this section shall be presumed to be assigned on the basis of race, color, or national origin.

20. § 185.44 C.F.R. reads in part:

(e) Classroom segregation: In the case of ineligibility under § 185.43(c), an application for waiver shall contain:

(1) Evidence that minority group children are not separated from nonminority group children by or within classes for more than 25 percent of the school day classroom periods, except in instances of bona fide ability grouping which meet the requirements of § 185.43(c), where such agency has demonstrated by clear and convincing evidence that such separation is educationally necessary and is the only available method of achieving a specific educational objective; and

(2) A statement of steps taken by such agency to insure that separation of minority and nonminority group children as prohibited by § 185.43(c) will not reoccur in the future.
(Public Law 92–318, sections 706(d)(1)–(3))

(f) Discrimination against children: In the case of ineligibility under § 185.43(d), an application for waiver shall contain evidence that the practice, policy, or procedure prohibited by § 185.43(d) has ceased to exist or occur and that the effects of such practice, policy, or procedure have been remedied or eliminated. In particular:

(3) In the case of assignment of students to classes on the basis of race, color, or national origin as prohibited by § 185.43(d)(5), such agency shall submit evidence that the groups, tracks, or classes resulting from such assignment have been completely eliminated and the students so

the most part reiterate the above requirements. However, it should be noted that § 185.44(e)(2) does require a "statement of steps taken by such agency to insure that separation of minority and nonminority group children as prohibited by § 185.43(c) will not reoccur in the future."

 We cannot say that "the action of HEW in requiring that the Board [comply with these regulations] as a condition of receiving emergency school aid, is arbitrary, beyond the authority of HEW, and contrary to federal law." Amended Complaint, Doc. 2, Para. (g). Rather, HEW was well within the scope of its authority in implementing the mandate of § 1605(d)(1)(C) in the manner that it has chosen. Cf. George v. O'Kelly, 448 F.2d 148 (5 Cir., 1971). We hold that these regulations are not "arbitrary and unreasonable," but, rather, that they are well designed for the purpose of "furthering federal educational policy." Doc. 2, Para. 10.

 It is worth observing that § 1605(d)(1)(C) and the regulations thereunder are largely declaratory of the evolving case law in this troublesome area. In our view it is well established that students may be assigned on the basis of ability to separate classes or tracks provided that this is not a subterfuge for racial discrimination. See, e. g., George v. O'Kelly, 448 F.2d 148, 150 (5 Cir., 1971); Murray v. West Baton Rouge Parish Sch. Bd., 472 F.2d 438, 444 (5 Cir., 1973); Miller v. School Dist. No. 2, Clarendon, S. C., 256 F. Supp. 370, 375 (D.S.C., 1966); Swann v. Charlotte-Mecklenburg Bd. of Ed., 300 F.Supp. 1358, 1367 (W.D.N.C., 1969); Moore v. Tangipahoa Parish Sch. Bd., 304 F.Supp. 244, 249 (D.La., 1969), app. dism'd, 421 F.2d 1407 (5 Cir., 1969); P. v. Riles, 343 F.Supp. 1306, 1312 (N.D. Cal., 1972); also see: United States v. Norcome, 375 F.Supp. 270, 286, 287–288

(D.D.C., May 21, 1974), aff'd, 162 U.S. App.D.C. 99, 497 F.2d 686 (1974). The leading decision is still Judge Skelly Wright's opinion, Hobson v. Hansen, 269 F.Supp. 401, 442–492 (D.D.C., 1967), aff'd, sub nom Smuck v. Hobson, 132 U. S.App.D.C. 372, 408 F.2d 175 (1969).

The most frequently encountered problem in this regard is that black persons and other disadvantaged groups often do not perform as well, on the average, as whites on generalized intelligence and aptitude tests. The reason for this has not been related to any lack of innate intelligence but rather primarily to socio-economic, cultural and educational deprivation and to various testing biases, Hobson v. Hansen, *supra*, at 442–492; George v. O'Kelly, *supra*, at 150; also see Arrington v. Mass. Bay Transportation Auth., 306 F.Supp. 1355, 1358 (D.Mass., 1969).

 To cope with this problem, federal courts have held that where classroom racial imbalance is shown and it is shown that testing procedures are a primary factor in the assignment of students to classes, the burden shifts to the school authorities to demonstrate some "substantial congruence" between the testing process and the purpose for which the assignments are allegedly used. Hobson v. Hansen, *supra*, at 492; P. v. Riles, *supra*, at 1311; Berkelman v. San Francisco Unified Sch. Dist., 501 F.2d 1264, 1267–1268 (9 Cir., July 1, 1974) (nn. 4 & 5, collecting cases and authorities); also see, Note, "Equal Protection and Intelligence Classifications," 26 Stan.L.Rev. 647, 650 (1974).

 With these precedents in mind we are of the opinion that § 185.-44(d)(5) is well supported by legal authority insofar as it creates a presumption that educationally unjustified student classroom assignments are the product of racial discrimination when such assignment practices result in ra-

---

assigned have been reassigned to classes on a nondiscriminatory basis; or that the students so assigned have been retested, re-evaluated, and, if necessary, reassigned

to groups, tracks, or classes which satisfy the requirements of § 185.43(e).
(Public Law 92–318, sections 706(d)(1)–(3))

cially isolated classes, at least where such classes would not otherwise occur. Griggs v. Duke Power Co., 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The effect of this regulation is simply to put the onus of establishing the educational justification on the federal aid applicant as opposed to requiring the responsible HEW officials to ferret this information out for themselves. This approach is certainly rational, and we hold therefore that this provision on its face is not invalid.

■ We are also of the opinion that § 185.43(c) is not invalid by reason of its interpretation of the language of the statute which prohibits "the separation of minority group from nonminority group children *for a substantial portion of the school day*" (unless justified), § 1605(d)(1)(C), as precluding such separation "for more than 25 percent of the school day classroom periods." Twenty-five percent *is* "a substantial portion of the school day," and this administrative rule is a practical and realistic one.

Indeed, nothing in the record before us indicates that compliance with this condition of eligibility "would have the effect of severely disrupting the operation of the Cincinnati school system." Amended Complaint, Para. 10. In fact, the CSD authorities insist that no discriminatory classroom assignments which would make the district ineligible

under these regulations had occurred,[21] and Dr. Waldrip orally assured the O.E. that none would occur during the program. See, *e. g.*, Doc. 11, Ex. 8; Doc. 7, A–6. Ms. Calais for HEW apparently was prepared to accept this at face value, provided only that Dr. Waldrip confirm these assurances in writing. A–6 at page 5; also see Doc. 7, at 9–10.[22]

Thus, Ms. Calais states in her letter of April 25:

"In this connection, the review team received your verbal assurance on April 17, 1974, that the procedure used in assigning students to classes would be modified to prevent in the future racially isolated or identifiable classes that are not educationally justified as provided in the Regulations. It is therefore our understanding that a written statement is being prepared for forwarding to the Office for Civil Rights which will assure that race will be included in the computerized scheduling process as a benign factor and that, until such time as this can be fully implemented, an interim method will be used to prevent or eliminate such improper assignments beginning September, 1974. Therefore, *assuming that such written confirmation is received, this area will not raise any question regarding eligibility*." (Emphasis in original)

21. The dispute apparently developed over HEW's requirement that the CSD document this and the CSD's difficulty in doing so or in its misunderstanding of what was required.

22. Whether under 20 U.S.C. § 1601 et seq. such assurances are specifically enforceable is an open question. *See:* United States v. Lovett, 416 F.2d 386, 390 n. 4 (8th Cir. 1969); compare United States v. Sumter County School Dist. No. 2, 232 F.Supp. 945 (D.S.C.1964) (yes), with United States v. Madison County Bd. of Ed., 326 F.2d 237 (5th Cir. 1964), cert. denied 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964) (no). These cases arose under 20 U.S.C. 241. *But see:* Bossier Parish Board v. Lemon, 370 F.2d 847, 848, 850–852 (5th Cir. 1967), holding that Madison County, *supra*, had to be disregarded in view of subsequent enact-

ment of the 1964 Civil Rights Act. *Also see:* United States v. Tatum Independent School Dist., 306 F.Supp. 285 (D.Tex.1969) (granting specific relief) (Civil Rights Act of 1964, § 601, 42 U.S.C. § 2000d). In the *Tatum* case, school officials had submitted desegregation plans and assurances of compliance to HEW for the purpose of obtaining and in consideration for federal financial assistance (which the school district subsequently obtained). The plans and assurances were accepted by HEW. But once assured of federal funding, the local school authority "amended" its "December" plan to restore its previous, *ineffective*, open enrollment plan. HEW sued, arguing that it was entitled to obtain injunctive relief to secure compliance with the school authority's assurances and implementation of the authority's December plan. The Court agreed.

But *not until July 27* were these assurances forthcoming, Dr. Waldrip admitting in his letter of that date that he had neglected to follow up on this matter. In short, this Court cannot assume that HEW's request that Dr. Waldrip confirm in writing his April 17 assurances was a condition to eligibility that "would have the effect of severely disrupting the operation of the Cincinnati School System." Amended Complaint, Para. 10.

### 2. *Transfers of property or services to nonpublic schools*

Turning now to the fourth, independent determination of ineligibility, the relevant statutory reference is § 1605(d)(1)(A):

"(d)(1) No educational agency shall be eligible for assistance under this chapter if it has, after June 23, 1972—

(A) transferred (directly or indirectly by gift, lease, loan, sale, or other means) real or personal property to, or made any services available to, any transferee which it knew or reasonably should have known to be a nonpublic school or school system (or any organization controlling, or intending to establish, such a school or school system) without prior determination that such nonpublic school or school system (i) is not operated on a racially segregated basis as an alternative for children seeking to avoid attendance in desegregated public schools, and (ii) does not otherwise practice, or permit to be practiced, discrimination on the basis of race, color, or national origin in the operation of any school activity."

An important point to note is that this provision quite clearly makes eligibility contingent on the making of the required determinations *prior* to any transfer of property or services by the applicant. A waiver of ineligibility could be obtained by any school district which was ineligible by reason of this provision by tendering an appropriate application to the Secretary (HEW) under § 1605(d). See: 45 CFR 185.44(b).

Section 1605(d)(1)(A) (set out above) has been implemented by HEW regulation 45 CFR 185.43(a):

"*No educational agency shall be eligible* for assistance under the Act *if*, after June 23, 1972, *it has transferred* (directly or indirectly by gift, lease, loan, sale, or any other means) *any real or personal property, or made available any services, to a nonpublic school* or *school system* (or any person or organization controlling, operating, or intending to establish such a school or school system) *without a prior determination that such nonpublic school or school system is not operated on a racially segregated basis* as an alternative for children seeking to avoid attendance in desegregated or integrated public schools, and that such nonpublic school or school system does not otherwise practice, or permit to be practiced discrimination on the basis of race, color, or national origin in admissions or in the operation of any school activity." (Emphasis in April 25 letter, doc. 7, A–6)

HEW bases this regulation on the statutory provision itself and on the following cases: Green v. Connally, 330 F. Supp. 1150 (D.D.C., 1971), aff'd sub nom. Coit v. Green, 404 U.S. 997, 92 S. Ct. 564, 30 L.Ed.2d 550 (1971); Wright v. City of Brighton, Alabama, 441 F.2d 447 (5 Cir., 1971), cert. den., 404 U.S. 915, 92 S.Ct. 228, 30 L.Ed.2d 190 (1971).

Plaintiffs do not seem seem to contest the validity of the regulation. It would be fruitless for them to do so as § 185.-43(a) merely paraphrases the statute. But it is worth noting, nonetheless, the importance of the requirement embodied in this subsection of the Act and its cognate regulation. In fact, in a very recent decision the Court of Appeals for the District of Columbia Circuit observed that this matter is imbued with constitutional overtones:

"It cannot be gainsaid that '[a] State's constitutional obligation re-

quires it to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial or other invidious discrimination.' Nor can it be disputed that '[s]tate support of segregated schools through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws.' Certainly the Fifth Amendment does not tolerate the Federal Government in an involvement with racially segregated education which the Fourteenth prohibits to the states. On the contrary, this court *en banc* has already recognized and enforced the Secretary's 'general obligation not to allow federal funds to be supportive of illegal discrimination'." Kelsey v. Weinberger, 162 U.S.App.D. C. 159, 498 F.2d 701, at 709–710 (1974). (Footnotes omitted.)

The District Court in Maryland agrees. Northeast Community Organization, Inc. v. Weinberger, 378 F.Supp. 1287, 1294 (D.Md., June 24, 1974). In that case certain Baltimore nonprofit organizations sued to challenge HEW's determination not to grant them ESAA funds in view of its (HEW's) determination that the Baltimore Local Educational Agency's "open enrollment plan" was in violation of the 1964 Civil Rights Act. The Court held that the provisions of the ESAA should be read to preclude HEW from awarding ESAA funds to NPOs under these circumstances, as any other interpretation might raise questions concerning the constitutionality of the Act, or at least of its administration:

"If ESAA is read to permit the dissemination of funds to NPOs where the LEA has neither a required plan of desegregation nor an approved Title VI or nonrequired plan to reduce,

eliminate or prevent minority group isolation, the constitutionality of the Act becomes an open question for this Court under binding principles frequently enunciated by the Supreme Court. *See, e. g.*, Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Bradley v. School Bd., 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965). Although this application seeks to remedy the effect of minority group isolation in five integrated elementary schools, it is also clear that a qualified plan of desegregation guards against the funnelling of federal funds through less scrupulous NPOs to perpetuate racial discrimination forbidden by the Constitution and the Civil Rights Act of 1964." Northeast Community Organization, Inc. v. Weinberger, *supra*, at 1294.

Upon similar reasoning, we would hold that the regulation under discussion here and its application by HEW in this case were rational, not an abuse of authority, and valid as a matter of law.

Again, the CSD was required, as was every other applicant, to assemble the necessary information and to make the required determinations. And, again, it is only in this respect that the CSD seems to have failed.[23] As we have already observed, the statutory provision explicitly requires that applicant school districts acquire sufficient information concerning nonpublic schools to which services or property are to be transferred and then make the requisite determinations of nondiscrimination *prior* to making any such transfers. The CSD, which had been making such transfers without the necessary information and without having made such determinations, cannot now complain that HEW was unreasonably demanding when in April it insisted that Cincinnati honor its (*i. e.,* HEW's) January request for these determinations. Doc. 7, A–1 (letter of January 18), at p. 3; A–6, at 6. We hold that this was not an abuse

---

23. Compare Para. (a) immediately above (classroom assignments).

of discretion on the part of HEW. But see, Adams v. Richardson, 156 U.S.App. D.C. 267, 480 F.2d 1159, 1166 (1973) (en banc).

The April 25 letter of ineligibility indicates—and this is undisputed—that the CSD was supplying services to at least seven nonpublic schools, and that at least six of these had not yet given CSD the requisite information on April 9. By April 18, three of these nonpublic schools still had not come forward with the information requested of them. And, "In addition, *the Cincinnati School District ha[d] not made, or forwarded, determinations with respect to the four schools which have furnished the necessary information.*" A–6, at 6 (emphasis in original). Not until June 27 did the CSD respond to this matter, and then Dr. Waldrip provided determinations only as to the three schools which had not previously supplied the necessary information, failing to make the required determinations in regard to the four other schools referred to in the April 25 letter (concerning which Cincinnati *did* have the necessary information.) Plaintiffs' Ex. 8. Also see, Doc. 13, at 13 and 16–17.

And, as already indicated, at no time did Cincinnati request a waiver of ineligibility as to this ground—although this apparently could easily have been done.

Nonetheless, plaintiffs (through counsel) contend that they are entitled to funding *despite* their noncompliance with these established departmental regulations and requirements—*and at the expense* of other school districts which did comply; leading us to question the statement of plaintiffs' counsel that defendants "live in a legal and sociological world in which they make up their own rules in arrogant defiance of the policy of the Congress and the legitimate interest of other local school boards." Letter of plaintiffs' counsel, November 5, 1974, p. 2.

In view of the serious nature of the charges that *have been made* in these proceedings, extreme care was exercised in the analysis of the legal and factual submissions of the parties. This analysis has led us to the conclusion that the Secretary did not abuse his discretion in approving the various regulations involved in this case, and to the conclusion that the decisions made by the HEW officials in denying Cincinnati's application for ESAA funds were not arbitrary, capricious or an abuse of authority. In taking the action it did HEW did not thwart the intent of Congress. The maze of regulations and statutes and case law which had to be considered by HEW in connection with Cincinnati's application may be "another world," but the purpose of the regulations and statutes is to assure that the money appropriated will be used where it will do the most good to achieve the purpose of the legislation, which is to reduce racial isolation in schools without impairment of the financial soundness of local educational agencies. Anyone failing to recognize this is himself living in a world of his own.

### V. FAILURE TO ESTABLISH ELIGIBILITY

Finally, we note that even if we were to assume the correctness of the Cincinnati School District's positions on each of the four grounds of ineligibility, it remains in doubt whether or not CSD had established its eligibility as required by the provisions of the Act, *supra.*

We begin with a premise that the CSD claim to eligibility arises under Sec. 1605(a)(1)(C)(i) or (ii) relative to a voluntarily adopted plan of integration.

The relevant language is the following:

"§ 1605. *Eligibility for assistance; grant and contract authority; limitation; ineligibility, waiver; waiver application, approval; notice to congressional committees*

(a)(1) The Assistant Secretary is authorized to make a grant to, or a contract with, a local educational agency—

(C) which has adopted and is implementing, or will, if assistance is made available to it under this Act, adopt and implement, a plan—

(i) to eliminate or reduce minority group isolation in *one* or more of the minority group isolated schools of such agency,

(ii) to reduce the total number of minority group children who are in minority group isolated schools of such agency."

Sec. 1605(a)(1)(c)(i)(ii)

In the jargon of the Act:

"(10) The terms 'minority group isolated school' and 'minority group isolation' in reference to a school mean a school and condition, respectively, in which minority group children constitute more than 50 per centum of the enrollment of a school."

Sec. 1619(10)

These statutory provisions are implemented—and to some extent explicated—by department regulations. Specifically, 45 CFR § 185.11(b)(2) states:

"(2) A local educational agency may apply for assistance under this subpart if it has adopted and is implementing, or will, if assistance is made available to it under this subpart, adopt and implement, a plan to eliminate or reduce minority group isolation in one or more of the minority group isolated schools of such agency,

or to reduce the total number of minority group children who are enrolled in minority group isolated schools of such agency.

(i) Elimination of minority group isolation, for purposes of this subparagraph, refers to a change in the enrollment of one or more schools operated by a local educational agency (pursuant to such plan) whereby the proportion of minority group children attending such school or schools is reduced from a proportion greater than 50 percent to a proportion of 50 percent or less.

(ii) Reduction of minority group isolation, for purposes of this subparagraph, refers to the reduction, but not below 50 percent (pursuant to such plan), of the proportion of minority group children attending one or more schools operated by a local educational agency at which school or schools such children constitute more than 50 percent of the enrollment."

 As already indicated, the burden is on the school district to establish its eligibility by providing the appropriate documentation and assurances. See § 185.11(c)(2). (Set out in margin).[24]

Moreover, the Act sets out specific "criteria" by which applications, including those of this type, are to be weighed. Of particular relevance, the Assistant Secretary is required to consider:

"(2) the degree to which the plan or activity described in section 1605(a)

---

24. (2) Where the eligibility of a local educational agency is based on a plan described in paragraph (b) of this section, such agency shall provide assurances and information satisfactory to the Assistant Secretary that such plan has been adopted and implemented, or will be adopted and implemented if assistance is made available to it under this subpart, including:

(i) A copy of a school board resolution or other evidence of final official action adopting and implementing such plan, or adopting and agreeing to implement such plan upon the award of assistance under the Act; and

(ii) In the case of a plan to be implemented upon the award of assistance under the Act, evidence that notice of the contents of such plan and of the intent to implement it upon the award of such assistance has been published in a newspaper of general circulation serving the school district of such agency no later than 20 days prior to submission by such agency of an application for such assistance.

of this title, and the program or project to be assisted, . . . are likely to effect a decrease in minority group isolation in minority group isolated schools . . ." 20 U.S.C. § 1609(c)(2).

From these statutory criteria the department has derived weighted guidelines (set out at 45 CFR § 185.14). Particularly pertinent is the concept of "effective net reduction in minority group isolation" adopted to effectuate the criterion of § 1609(c)(2) (set out above). This concept or guideline is defined in § 185.14(a)(2).[25]

Primarily these criteria or guidelines are utilized in ranking eligible applications, but it appears that the "effective net reduction" guideline is also used, or at least may have been used in this case,[26] to determine whether or not an application is one "which sets forth a program, project, or activity of such insufficient promise for achieving the purpose of the Act that its approval is not warranted." § 185.14(c)(2).

As has already been indicated, the Department of HEW attempted many times over several months to obtain from Cincinnati School District officials the information necessary to make routine application of these guidelines. Thus, as early as January, Ms. Stromberg wrote Dr. Waldrip:

"[I]n order to complete our review of your District's eligibility for funding under the Emergency School Aid Act, it is necessary that we obtain the following information:

"I. Implementation of Desegregation Plan

"Your District's application states that eligibility is based upon the implementation of voluntary plans to reduce minority group isolation in the school district. Thereafter three specific plans are mentioned as having been implemented. * * * With respect to the open enrollment plan implemented September, 1973, no data has been furnished whereby it can be determined whether implementation of the plan has resulted in any elimination or reduction of minority group isolation in one or more

---

25. § 185.14 Criteria for assistance.

(a) *Objective criteria.* In approving applications for assistance by local educational agencies under this subpart, the Assistant Secretary shall apply the following objective criteria (90 points):

(1) The need for such assistance, as indicated by the number and percentage of minority group children enrolled in the schools of such agency for the fiscal year or years for which assistance is sought, as compared to other school districts in the State (30 points); and

(2) The effective net reduction in minority group isolation (in terms of the number and percentage of children affected), in all the schools operated by such agency accomplished or to be accomplished by the implementation of a plan or project described in § 185.11 and the program, project, or activity to be assisted (60 points). The term "effective net reduction in minority group isolation," for purposes of this subparagraph, means (i) the weighted net change effected or to be effected by such plan or project in the number of mi-

nority group children enrolled in minority group isolated schools operated by such agency, and (ii) the weighted net total of minority group children placed or to be placed as a result of such plan or project in a school in which the proportion of minority group children has been reduced (but remains greater than 50 percent). Minority group children placed as a result of such plan or project in schools in which the proportion of minority group children has been increased (and is greater than 50 percent) shall be counted against the reduction credited to such agency under this subparagraph. Such effective net reduction shall be computed between the fiscal year (or relevant portion thereof) immediately preceding implementation of such plan or project and the first fiscal year (or relevant portion thereof) for which assistance is sought under the Act. (Public Law 92–318, sections 710(c)(1), (2) and (3))

26. Doc. 7:A–7 (Letter of Ms. Stromberg to Mr. Mines of March 13, 1974). See also Doc. 7:A–9.

schools. * * * Therefore, in my opinion there is a serious question whether your district has satisfied the eligibility for assistance requirements as set forth in section 185.11 of the Regulations." Doc. 7:A–1 January 18, 1974.

This letter in fact spelled out the specific information needed to establish eligibility under the Open Enrollment Plan. In part, Ms. Stromberg requested:

"2. Name and racial identification of each student transferring pursuant to the open enrollment plan. Indicate both the former and receiving schools for each student.

"3. Name and racial identification of students whose requests for transfer were denied, together with the reasons therefor." Doc. 7:A–1, p. 2.

Significantly, Ms. Stromberg *also* requested information concerning the Board actions of December 10, 1973 and January 14, 1974 (A–1, p. 2). *Inter alia,* Ms. Stromberg sought:

"4. A statement describing in full detail your current plans for implementation of the January 14, 1974 Resolution and an explanation of the extent to which this Resolution modifies or changes any plans previously made for the implementation of December 10, 1973 Resolution." (A–7, p. 2)

This letter, therefore clearly indicates that the CSD had not established its eligibility for ESAA funding *prior* to any consideration by HEW of the effect of the nonimplementation resolution (or for that matter *prior* to approval by the CBE of the nonimplementation order).

On February 8, 1974, Ms. Stromberg again wrote Dr. Waldrip, stating that she had "not received any of the material requested regarding the implementation of a desegregation plan within the purview of section 185.11(b) of the ESAA Regulations." Doc. 7:A–2. Aft-

er discussing a problem regarding the printing of the Board minutes for the December and January Board of Education meetings (which were requested in her January 18 letter), Ms. Stromberg stresses the importance of coming forward with the other necessary data to support the school district's eligibility —referring (apparently) to the data regarding the Open Enrollment Plan:

" . . . At the present time, therefore, I believe it is advisable to inform you that we have not received the minutes, *and more important to emphasize the absolute necessity of furnishing evidence at the earliest possible time that the provisions of Section 185.11 of the Regulations have been satisfied.* This matter is quite urgent because until such time as your District has demonstrated that it has met the eligibility requirements of Section 185.11, there is no basis for conducting a further review" (Doc. 7:A–2, p. 1) (Emphasis added.)

Obviously, this letter refutes plaintiffs' attorneys' claim that Cincinnati was assured of entitlement *but for* the eleventh-hour position of HEW regarding the nonimplementation resolution since at this point HEW attention continued to focus on the Open Enrollment Plan— although information was also being sought to determine what effect, if any, the nonimplementation resolution might have on Cincinnati's eligibility.

Some information, it seems, was sent in response to these requests, for on February 22, 1974, Mr. Barr wrote Dr. Waldrip to confirm a telephone conversation with Mr. Grate concerning "the material already received and the need for additional information and documents." (Doc. 7:A–3, p. 1).[27] Mr. Barr also indicated that "the information submitted in response to Part I, A.I. of our letter of January 18, 1974, *did not list any school wherein minority group isolation was either reduced or eliminated.*

---

27. Copies of this letter were sent to Ms. Stromberg and to Mr. Grate. What information was forwarded is not clear.

This is true because the percentage of minority group students increased at Hughes, which was the only school listed having more than 50 percent minority students." (Emphasis added.)

By analyzing the data which had been submitted, Mr. Barr found:

that there had been a slight reduction of minority group isolation at four schools as follows:

| SCHOOL | % MINORITY ENROLLMENT 72–73 | 73–74 | # OF MINORITY MINORITY STUDENTS TRANSFERRING OUT | % REDUCTION |
|---|---|---|---|---|
| Burton | 99.8 | 99.5 | 4 | .3 |
| Douglas | 99.6 | 97.7 | 3 | 1.9 |
| Hoffman | 99.6 | 99.5 | 5 | .1 |
| Taft | 98.6 | 97.8 | 4 | .8 |

Evidently, Mr. Barr considered this reduction rather minimal. He therefore requested:

"Please advise whether the foregoing accurately shows the full extent of reduction of minority group isolation and whether there are any additional minority group isolated schools at which minority group isolation was either reduced or eliminated as a result of the implementation of your Open Enrollment Plan" (A–3, p. 1).

(The information with which Mr. Barr was working, Mr. Grate of Cincinnati now admits, only went to the effect of the program of Open Enrollment during the summer of 1973 when the program first began. [doc. 11, Grate Affidavit Para. 7, at p. 4])

On March 13, Ms. Stromberg informed Regional Director Mines by letter of the status of the Cincinnati application. Her letter states that the application contained both the December resolution and also reference to the September, 1973, Open Enrollment Plan, although no data was submitted to show the effect of the latter plan (Doc. 7:A–7).

Ms. Stromberg states that the initial "turnaround" decision of basic eligibility was based on the December 10 plan, but that the new school board had resolved not to implement that plan, and

that "therefore, eligibility became contingent upon the Open Enrollment Plan referred to in the LEA's [i. e., Cincinnati's] application" (p. 1). (Emphasis added.) Accordingly, Dr. Waldrip "was requested to submit data on the number of students transferred pursuant to the Open Enrollment Plan and the degree to which minority group isolation was thereby reduced in one or more schools." The data submitted in response to these requests, Ms. Stromberg informs Director Mines, showed that there had been only a slight reduction of minority isolation and only in four elementary schools. This, Ms. Stromberg felt, raised a question in regard to the Regulation 185.-14(a)(2) criterion of "effective net reduction in minority group isolation." "Given the minimal reduction of minority group isolation which can be attributed to the Open Enrollment Plan," her letter concludes, "and the importance which the Regulations ascribed to this factor in making funding decisions, I wished to call this matter to your attention promptly" (A–7, p. 2). While a copy of this letter was not sent to the Cincinnati officials, it nonetheless forcefully shows that disregarding entirely any question concerning the January nonimplementation resolution, Cincinnati had not—at least as of mid-March —established its eligibility or entitlement to funds under the Open Enrollment Plan.

Meanwhile, on March 7 and on April 3, both sides held talks, and during these talks HEW expressed growing concern over the nonimplementation of the December plan or an alternative plan that would be "equally effective in reducing the isolation or segregation of minority group students" within Cincinnati public schools. Thus, this issue becomes predominant in the letters of April 5, and April 25 (A–5, p. 4; A–6, p. 1–3). The letters and documents through April 25 do not, therefore, reveal whether the Cincinnati School District could have or would have established its eligibility under the Open Enrollment Plan, had this aspect not become eclipsed by the "nonimplementation" controversy.

But in light of the letter of July 5, 1974, of Dr. Mines to Dr. Waldrip (attached to the letter of plaintiffs' counsel of November 27, 1974), it seems safe to conclude that HEW had decided that the CSD plan was not adequate for funding when measured against the "effective net reduction" criterion. Dr. Mines states:

> "On the basis of the data you have furnished regarding implementation of the open enrollment plan which your District initiated in September, 1973, it is clear that it achieved only minimal results in reducing minority group segregation during the 1973–74 school year. Analysis of the January 14, 1974 Resolution and all of the information furnished by your District discloses that, with respect to the reduction or elimination of minority group segregation, it is essentially the same as the 1973–74 open enrollment plan. *Although* this office has requested data to evaluate the January 14, 1974 plan, no information has been furnished which would afford any basis for concluding that it will result in any substantial reduction of student segregation." At page 2.

Being undisputed, the Court accepts this as true. Thus, were it necessary to do so, the Court would be inclined to hold that the case was rendered moot by virtue of the failure of the CSD to submit a plan which showed sufficient promise to merit funding under the relevant criteria unless plaintiffs were able to show that this particular criterion—i. e., the effective net reduction guideline—was invalid under the Act or applicable constitutional standards.

## VI. CONTINUING CONTROVERSY

From all the foregoing it is evident that this Court cannot now resolve the issues underlying the dispute between the parties regarding the non-implementation of the December Plan of desegregation and that it will not be necessary for it to do so insofar as the specific funds involved in this litigation are concerned. However, additional facts drawn to the Court's attention by Counsel in a letter dated November 27, 1974 (Doc. 19 and Attachments) suggest that this dispute is likely to represent a continuing controversy between the parties and that future attempts by the CBE to secure funds under the ESAA program or other related programs may well be frustrated thereby. Additionally, the District Director of HEW has threatened to refer the problem to the Washington office of HEW for appropriate legal action under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000c et seq. This might involve either administrative proceedings seeking the termination of all federal assistance to the Cincinnati schools or referral to the Department of Justice for court action. Letters of Kenneth Mines, Regional Director HEW, to Dr. Waldrip dated July 5 and November 13, 1974. In this sense at least, there exists a real and continuing controversy between the parties over which the Court might retain jurisdiction. See: Dermott Special School Dist. of Chicot County v. Gardner, 278 F. Supp. 687 (D.Ark.1968). In that litigation, as in this, HEW was charged with imposing on a school district unlawful prerequisites to receipt of federal assistance. But at the time of the Court's decision, however, the school district was operating under a mutually satisfactory

arrangement with HEW, although there was no indication that HEW had abandoned its challenged practices and no assurance that it would not in the future pursue them. The Court held (and we would *agree*) that under these circumstances a suit for declaratory relief is not "moot." *Id.,* at 691–692; Kelley v. Metropolitan Co. Bd. of Ed., Tenn., 372 F.Supp. 528; cf. Kelley v. Altheimer, 378 F.2d 483, 499 (8th Cir. 1967).

But in view of our determination of the various issues dealt with in this opinion, the non-implementation controversy is in fact moot *with respect to plaintiffs' request for injunctive relief in regards to the requested 1973 fiscal year funds.* The question then is the propriety of retaining jurisdiction over the case solely for the purpose of resolving the continuing dispute with HEW over non-implementation. Cf. Dermott Special Sch. Dist. of Chicot County v. Gardner, *supra,* at 278 F.Supp. 692. This in turn raises questions concerning "ripeness" and the proper scope of declaratory relief.

■ The Court has carefully considered these questions, and finds that the threat of proceedings under the 1964 Civil Rights Acts is not a matter over which it may properly assume jurisdiction in the context of the present action. Until a final order or decision has been made by HEW with respect to the termination of federal assistance to the school district for failure to desegregate, judicial intervention is neither sanctioned by the 1964 Act, 42 U.S.C. § 2000d(2), nor may it be had on an equitable basis. A case precisely on point is Taylor v. Cohen, 405 F.2d 277 (4th Cir. 1968). There the Department of HEW had indicated its intention to terminate federal assistance to the Richland County School District of South Carolina unless it abandoned its free transfer desegregation plan in favor of a zoning and pairing plan. When the local school authorities capitulated, parents of white school children in the school district brought a class action suit against HEW

for a declaratory judgment that it had abused its authority. The Court concluded that "neither a statutory nor an equitable basis exists for enjoining HEW's conduct at this stage of the proceedings. Judicial review must await the outcome of the administrative hearing *[if any].*" *Id.,* at 405 F.2d 281. In short, this aspect of the controversy is not "ripe."

■ We are likewise persuaded that the possibility that future ESAA funds might be denied on this same ground of ineligibility is a claim which lacks the requisite degree of ripeness. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Helco Products Co. v. McNutt, 78 U.S. App.D.C. 71, 137 F.2d 681 (1943); Turkel v. Food and Drug Administration, 334 F.2d 844 (6th Cir. 1964), cert. denied, 379 U.S. 990, 85 S.Ct. 704, 13 L. Ed.2d 611 (1965). An apt statement of the law is the following: "The doctrines of ripeness and finality are designed to prevent premature judicial intervention in the administrative process, before the administrative action has been fully considered, and before the legal dispute has been brought into focus." Environmental Defense Fund v. Hardin, 138 U.S. App.D.C. 391, 428 F.2d 1093, 1098 (1970). Moreover, we are aware that pursuit of this matter at this time would raise again the question of exhaustion. Myers v. Bethlehem Ship Building Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); cf. McCart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

■ Further, we do not think that an inquiry of this nature is within the proper scope of an action for declaratory relief. The question in each case in which declaratory relief is sought is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests that is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. See, *e. g.,* Cunningham Bros. Inc.

v. Bail, 407 F.2d 1165 (5th Cir. 1969), cert. denied, 395 U.S. 959, 89 S.Ct. 2100, 23 L.Ed.2d 745 (1969); Koppell v. Levine, 347 F.Supp. 456 (E.D.N.Y.1972). The mere possibility that Cincinnati will again apply for ESAA funding and again be denied funds for failure to implement the December Resolution or some alternative plan equally promising in the judgment of HEW does not present the Court with a situation of "sufficient immediacy" to warrant declaratory relief. In this sense, the case is analogous to U. S. Steel Corp. v. Fri, 364 F.Supp. 1013 (N.D.Ind.1973), an action by a steel producer for a declaratory judgment setting aside an order of the Environmental Protection Agency directing the producer to implement a program for control of emissions. The Court held that, even assuming it had jurisdiction, review of the requirement as to submission of emission control plans was not appropriate in that the controversy involved complicated factual and legal issues, was subject to change in an ongoing administrative action, and had no immediate effect absent an enforcement order. 364 F.Supp. at 1018–1019. The same is true in this case.

But in this case, there is an additional reason to deny declaratory relief. The issues involved in this case in regard to the non-implementation dispute are the subject of another action before this Court. Bronson et al. v. Board of Education et al., No. C–1–74–205 (filed May 29, 1974). The applicable rule is that where an action for declaratory relief presents issues which will necessarily be settled by another pending action, the Court should weigh the relative merits of each of the two actions as of the time of the hearing on the motion to dismiss. McGraw-Edison Co. v. Preformed Line Products Co., 362 F.2d 339 (9th Cir. 1966), cert. denied, 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966); Continental Insurance Co. v. Bayless & Roberts, Inc., 366 F.Supp. 287, 289 (D.Alaska 1973); Yellow Cab Co. v. City of Chicago, 7 Cir., 186 F.2d

946, 950–51; 6 Moore, Federal Practice § 57.08(6), at 3043 (2d ed. 1965). This is not to say that this Court must necessarily dismiss this action merely because of the existence of another adequate legal remedy, but rather that it may do so if other factors make this appropriate. Rule 57, F.R.Civ.P.; American States Inc. Co. v. D'Atri, 375 F.2d 761 (6th Cir. 1967); Western Cas. & Sur. Co. v. Teel, 391 F.2d 764 (10th Cir. 1968); Tyrill v. Alcoa S. S. Co., 172 F. Supp. 363, aff'd, 266 F.2d 27 (2d Cir. 1959); Note, Availability of a Declaratory Judgment When Another Suit is Pending, 51 Yale L.J. 511 (1942); Wright, Law of Federal Courts § 100, at 448–9 & n. 21 (2d ed. 1972).

The two principal criteria used by the courts are whether the declaratory relief sought will serve a useful and practical purpose and whether it will terminate the controversy and afford relief from uncertainty on the underlying issues. See, e. g., Kephart v. Wilson, 219 F.Supp. 801 (D.Tex.1963), aff'd sub nom. Chandler v. David, 350 F.2d 669 (5th Cir. 1965), cert. denied 382 U.S. 977, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966); Sears, Roebuck & Co. v. American Mut. Liability Ins. Co., 372 F.2d 435 (7th Cir. 1967); McGraw-Edison Co. v. Preformed Line Products Co., *supra*. The determinative factor is whether the declaratory judgment action will probably result in a just and more expeditious and economical determination of the entire controversy. Aetna Ins. Co. v. Transamerica Ins. Co., 262 F.Supp. 731 (D.Tenn.1967); Firemen's Ins. Co. of Newark, N. J. v. Riley, 322 F.Supp. 349 (W.D.Ky.1971); Western v. McGehee, 202 F.Supp. 287 (D.Md.1962). In short, a district court has discretion to refuse a declaratory decree where the relief sought would not terminate the controversy giving rise to the proceedings, see e. g., United States v. Cincinnati Transit Inc., 337 F.Supp. 1068 (S. D.Ohio 1972); or where the action is being used for "procedural fencing," see e. g., Firemen's Ins. Co. of Newark, *su-*

**250**

*pra*; Western v. McGehee, *supra*; or where the alternative remedy is better or more effective or where a pending action will dispose of all the controverted issues, see e. g. Allstate Ins. Co. v. Philip Leasing Co., 214 F.Supp. 273 (D.S.D. 1963). See generally: McGraw-Edison Co., *supra*; Sears, Roebuck & Co. v. American Mut. Liability Ins. Co., *supra*; Sears, Roebuck & Co. v. Zurich Ins. Co., 229 F.Supp. 518 (D.Ill.1969); cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). While the rule is often stated that a suit under the Declaratory Judgment Act is not appropriate where proceedings on the matter in issue are already pending, e. g., McSurely v. Ratliff, 282 F.Supp. 848 (E.D.Ky.1967), app. dism'd, 390 U.S. 412, 88 S.Ct. 1112, 19 L.Ed.2d 1272 (1968); Richardson v. Dudley, 295 F. Supp. 181 (D.N.Y.1969); the right to maintain a declaratory judgment action does not depend on which party filed suit first. The purpose of the Declaratory Judgment Act is not to encourage a race to the courthouse. Firemen's Ins. Co. of Newark, N. J. v. Riley, 322 F. Supp. 349 (W.D.Ky.1971).

In our judgment, due to the pendency of the *Bronson* case, it is not necessary to resolve in this action the merits of the non-implementation controversy. In the event that these issues are resolved against the present plaintiffs in that action (in which they appear as defendants), the Cincinnati School District will be required by court order to implement an appropriate plan of desegregation. In that case, the present controversy would not reoccur as any application for ESAA funding would be subject to the conditions of 20 U.S.C. § 1605(a)(1)(A)(i) (as opposed to § 1605(a)(1)(C)), in which case the non-implementation question would not come up again. On the other hand, in the event that that litigation is resolved in favor of the School Board, this Court is of the view that OCR–HEW can be expected to honor that judicial determination.

Indeed, the appropriate concern of the Court is that the declaratory judgment procedure not be used to preempt and prejudge issues that are committed for initial decision to an administrative unit of the executive branch. Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 73 S. Ct. 236, 97 L.Ed. 291 (1952), noted, 3 Utah L.Rev. 388; *also see* Wright, Law of Federal Courts (2d ed. 1970) § 100, at 449 & n. 24 (and cases collected there). We also note that the Supreme Court has warned against granting a declaratory judgment on the basis of a sparse and inadequate record in cases which like the present one involve important questions of public law. A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 82 S.Ct. 337, 7 L. Ed.2d 317 (1962); Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962); also see: Washington Public Power Supply System v. Pacific Northwest Power Co., 332 F.2d 87 (10th Cir. 1964); Firemen's Ins. Co. of Newark, *supra*.

While it would be possible in this case to supplement the present record by trial, joining this action if necessary with the *Bronson* litigation, caution nevertheless dictates that the Court stay its hand: Review of the non-implementation issue in this case would be limited by the requirement that the Court review only the record before HEW and that it weigh that record only for determination as to whether HEW abused its discretion in finding that Cincinnati was guilty of "discrimination against children," whereas, in the *Bronson* case, the Court may exercise more fully its own judgment and may have brought before it all the relevant evidence. That suit also presents in simpler fashion the question of the collateral effect of the prior Cincinnati desegregation litigation. *Deal, supra*; see Bronson v. School Board, *supra*, Opinion of January 30, 1975.

Finally, we note that our decision (that the claim regarding HEW's

determination of ineligibility with respect to the non-implementation issue is moot insofar as fiscal 1973 funds are concerned) does not raise the specter of a controversy "capable of repetition, yet evading review." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); Carroll v. Princess Anne, 393 U.S. 175, 178–179, 89 S. Ct. 347, 21 L.Ed.2d 325 (1968); United States v. W. T. Grant Co., 345 U.S. 629, 632–633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). The non-implementation controversy here was made moot by the failure of the CSD to establish its eligibility and to refute its non-ineligibility on other grounds. These grounds are not likely to reoccur. Likewise, other factors of course may intervene which would make Cincinnati ineligible for other, different, reasons—e. g., funds for its desegregation plans may become available from other sources, making Cincinnati ineligible for funds from the ESAA appropriation.

In sum, for all of the foregoing reasons, the present litigation must be brought to an end.